UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 1:04-CV-10651-DPW |
| THE BLACK & DECKER CORPORATION, ) | |
| BLACK & DECKER, INC., BLACK & DECKER ) | |
| (U.S.) INC., EMHART CORPORATION, and ) | |
| EMHART INDUSTRIES, INC., ) | |
| ) | |
| Defendants. ) | |

**APRIL 2004 SUPPLEMENTAL MEMORANDUM
OF BLACK & DECKER IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**FARREL/ SHW CLAIM**

April 16, 2004

Jack R. Pirozzolo, BBO# 400400
Richard L. Binder, BBO#043240
Judith S. Ziss, BBO# 544937
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Attorneys for Defendants

**PROTECTED INFORMATION**

By Order of Court, this envelope is to remain sealed and the Clerk of this Court shall not reveal the contents thereof to any person other than the Court or attorneys of record for the parties until further order of this Court.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS      i

TABLE OF AUTHORITIES      iii

I.    INTRODUCTION      1

II    OWNED PROPERTY EXCLUSION INAPPLICABLE      3

    A.    Groundwater Is Not "Owned Property" In Connecticut      4

        1.    The Connecticut Water Diversion Policy Act      5

        2.    Declaration Of Public Trust In Water      8

        3.    Groundwater Is Not "Owned Property" In Other States With Comparable Provisions Regarding Groundwater      9

            a.    "Reasonable Use" States      9

            b.    New York, A Trusteeship State      12

    B.    Non-Owned Property Is Contaminated And/Or Threatened At The Ansonia And Derby Sites      13

        1.    The Duty To Defend Under The Quinn Rationale      13

        2.    The Duty To Indemnify Under The Quinn Rationale      14

            a.    The Connecticut Regulatory Framework      15

            b.    Remediation Protects Rivers And Other Non-Owned Property      16

    C.    Costs To Comply With State-Imposed Standards Fall Outside The Owned Property Exclusion      19

III.  THERE ARE FURTHER BASES FOR DENYING NOTICE,
ONE-YEAR REPORTING, AND TENDER DEFENSES    20

    A.  Timeliness And Sufficiency Of Notice    20

        1.  Pleading Issue    21

        2.  Liberty Mutual Was Not Prejudiced    25

        3.  Impact Of The Four Corners Rule    27

    B.  The One-Year Reporting Clause Does Not Bar The Claims    28

    C.  There Is No Tender Requirement    31

IV.  "ACCIDENT DEFINED" OR "OCCURRENCE"    32

V.  THE DEFENSES WERE ALL WAIVED    33

VI.  CONCLUSION    35

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

Aetna Casualty and Surety Co. v. Murphy, 538 A.2d 219
    (Conn. 1988)                                               29

Alderman v. Hanover Insurance Group, 236 A.2d 462
    (Conn. 1967)                                               34

Allstate Ins. Co. v. Quinn Constr. Co. 713 F.Supp. 35
    (D.Mass. 1989), vacated as a result of settlement,
    784 F.Supp. 927 (D.Mass. 1990)                             3, 13,
                                                               14, 19,
                                                               20

BEC Corp. v. Department of Environmental Protection,
    775 A.2d 928 (Conn. 2001)                                  5

Bridgman v. Sanitary District of Decatur, 517 N.E.2d 309
    (Ill. App. 1987)                                           10

Burns v. Koellmer, 527 A.2d 1210 (Conn. 1987)                      23

Carey Canada, Inc. v. California Union Ins. Co,
    748 F.Supp. 8 (D.D.C. 1990)                                34

Cargill, Inc. v. Evanston Ins. Co., 642 N.W.2d 80 (Minn. 2002)     10

City of Waterbury v. Town of Washington,
    800 A.2d 1102 (Conn. 2002)                                 5-7, 12

Clinchfield Coal Corp. v. Compton, 139 S.E. 308 (Va. 1927)        10

Colonial Tanning Corp. v. Home Indemnity Co.,
    780 F.Supp. 906 (N.D.N.Y. 1991)                            13

Conway v. Travelers Casualty & Surety Co.,
    2000 WL 1918051 (Conn. Super. 2000).                       27

Danulevich v. Hartford Fire Ins. Co., 421 A.2d 559
    (Conn. Super. App. 1980)                                   33

Endicott Johnson Corp. v. Liberty Mutual Ins. Co.,
    928 F.Supp. 176 (N.D.N.Y. 1996), appeal dismissed,
    116 F.2d 53 (2d Cir. 1997)                                 29

**Cases**                                                                        **Page(s)**

Enron Corp. v. Lawyers Title Ins. Corp., 999 F.2d 360
    (8th Cir. 1993)                                                                        34

Fireman's Fund Ins. Co. v. Bradley Corp.,
    660 N.W.2d 666 (Wis. 2003)                                                      26, 27

Frontis v. Milwaukee Insurance Co., 242 A.2d 749
    (Conn. 1968)                                                                        34

Hartford Casualty Insurance Co. v. Litchfield Mutual Fire
    Insurance Co., 835 A.2d 91 (Conn. App. 2003),
    certification granted, 268 Conn. 912, 913 (2004)                                29

Higday v. Nickolaus, 469 S.W.2d 859 (Mo. App. 1971)                                11

Home Ins. Co. v. National Union Fire Ins. of Pittsburgh,
    658 N.W.2d 522 (Minn. 2003)                                                      32

Liberty Mutual Ins. Co. v. The Black & Decker Corp., et al,
    CA. No. 96-10804-DPW, D. Mass., Memorandum and
    Order Regarding Summary Judgment of December 5, 2003            25, 32

Loda v. H.K. Sargeant & Associates, 448 A.2d 812
    (Conn. 1983)                                                                        35

Maryland Cas. Co. v. Wausau Chemical Corp.,
    809 F.Supp. 680 (W.D.Wis. 1992)                                              11, 12

Missionaries of the Company of Mary, Inc. v. Aetna
    Casualty and Surety Co., 230 A.2d 21 (Conn. 1967)                            4, 14

Paige v. Town Plan and Zoning Commission of the
    Town of Fairfield, 668 A.2d 340 (Conn. 1995)                                    9

Patz v. St. Paul Fire & Marine Ins. Co., 15 F.3d 699
    (7th Cir. 1994)                                                                   3, 19,
                                                                                          20

Peck v. Public Service Mutual Ins. Co., 326 F.3d 330
    (2d Cir.), cert. denied, 124 S. Ct. 540 (2003)                              25-27

R.C. Bigelow, Inc. v. Liberty Mutual Ins. Co., 287 F.3d 242
    (2d Cir. 2002)                                                                      24

**Cases**                                                                 **Page(s)**

R.E.O., Inc. v. Travelers Cos., 1998 WL 285836
    (Conn. Super. 1998)                                      4, 13

Red Hill Coalition, Inc. v. Town Plan and Zoning
    Commission of the Town of Glastonbury,
    563 A.2d 1347 (Conn. 1989)                                  9, 12

Schenk v. City of Ann Arbor, 163 N.W. 109 (1917)                11

Shareamerica, Inc. v. Ernst & Young, 1999 WL 545417
    (Conn. Super. 1989)                                         22

Starr v. Commissioner of Environmental Protection,
    627 A.2d 1296 (Conn. 1993)                                  4, 12,
                                                                19

State of New York v. New York Central Mutual Fire Ins. Co.,
    542 N.Y.S.2d 402 (App. Div. 1989)                           12

State of Wisconsin v. Michels Pipeline Construction, Inc.,
    217 N.W.2d 339, supplemented on rehearing,
    219 N.W.2d 308 (Wis. 1974)                                  11

Swift & Co. v. Peoples Coal & Oil Co., 186 A. 629 (Conn. 1936)  19

Textron, Inc. v. Liberty Mutual Ins. Co., 639 A.2d 1358 (R.I. 1994)  29

Torres v. Kmart Corp., 233 F.Supp. 2d 273 (D.P.R. 2002)         34

Travelers Ins. Co. v. Namerow, 807 A.2d 467 (Conn. 2002)       22

United States v. Conservation Chemical Co., 653 F.Supp.         10, 11
    152 (W.D.Mo. 1986)

United States Aviex Co. v. Travelers Ins. Co.                   11
    336 N.W.2d 838 (Mich. App. 1983)

United Technologies Corp. v. American Home                      4
    Assurance Co., 989 F.Supp. 128 (D. Conn. 1997)

Veits v. City of Hartford, 58 A.2d 389 (Conn. 1948)            23

Wentland v. American Equity Insurance Co.,
    840 A.2d 1158, 1163 (Conn. 2004)                            30

**Cases**                                                                                    **Page(s)**

<u>Young</u> v. <u>American</u> <u>Fidelity</u> <u>Insurance</u> <u>Co.</u>, 479 A.2d 244
    (Conn. App. 1984)                                                         34

**Statutes**

C.G.S.A. §§22a-14 through 22a-20                                                                8

C.G.S.A. §22a-15                                                                                8

C.G.S.A. §22a-16                                                                                8

C.G.S.A. §22a-19                                                                                8

C.G.S.A. §§ 22a-365 through 22a-380                                                             5

C.G.S.A. §22a-366                                                                               7, 11

C.G.S.A. §22a-367(9)                                                                            5

C.G.S.A. §22a-368                                                                               6

C.G.S.A. §22a-369                                                                               6

C.G.S.A. §22a-373                                                                               6, 11

C.G.S.A. §22a-377                                                                               6

C.G.S.A. §22a-380                                                                               7

C.G.S.A. §§ 22a-416 through 22a-484                                                             5

C.G.S.A. §22a-452                                                                               23, 24

Illinois Water Use Act of 1983, 525 Ill.C.S. §45/1 et seq.                                      10

Illinois Water Use Act of 1983, 525 Ill. C.S. §45/6                                             10

McKinney's Navigation Law, § 170                                                                12

McKinney's Navigation Law, § 172(12)                                                            12

McKinney's Navigation Law, §172(18)                                                             12

**Rules**                                                                          **Page(s)**

Fed. R. Civ. P. 8(c)                                                                  33

**Regulations and Other Administrative Materials**

Regs. Conn. State Agencies, §22a-133k-1 et seq.                                        15

Regs. Conn. State Agencies, §22a-133k-2                                                15

Regs. Conn. State Agencies, §22a-133k-3                                               15,16

Regs. Conn. State Agencies, §22a-133k-3(b)(1)                                          16

Regs. Conn. State Agencies, §22a-377(c)-1(a)(1)                                         6

1986 Conn. Op. Atty. Gen. 80.                                                           7

**Other Authorities**

Black's Law Dictionary (6th ed.), West Publishing Co. (1990)                           30

Restatement (Second) Torts ("Restatement"), Introductory Note
    to Division 10, Chapter 41, Topic 4                            10

Webster's Third New International Dictionary (Unabridged),
    Merriam-Webster, Inc. (1993)                                  30, 31

Webster's New International Dictionary (India Paper Ed.),
    G. & C. Merriam Company (1932)                                  31

Wright & Miller, 5 Federal Practice & Procedure, § 1271                              33, 34

I.    <u>INTRODUCTION</u>

This Court heard argument on summary judgment regarding the Farrel and SHW claims pertaining to the Ansonia and Derby sites on July 10, 2003.[1]

In February 1998 the parties had filed cross-motions for summary judgment pertaining to all the sites, with briefs filed in February and March of that year. See excerpts in Vol. 1.  In the fall of 1998, the Farrel/SHW claims were briefed again. Black & Decker filed its Further Memorandum In Support of Black & Decker's Motion For Summary Judgment With Respect To Farrel and SHW Sites on November 13, 1998 ("Nov. 1998 Mem.") and its Reply Memorandum Regarding Maryland and Connecticut Sites on December 4, 1998 ("Dec. 1998 Mem.).  On January 7, 1999, Black & Decker filed its Supplemental Submission Regarding The Newly Raised Issues Of Tender And Notice/Prejudice ("Notice Brief").  This briefing, along with the associated appendices, was repackaged and resubmitted on September 27, 2002 pursuant to Order of September 11, 2002.  The three above-referenced briefs can be found in Vol. 7 of that submission.

After the July 2003 argument, there were several small submissions.  On July 17, 2003, Black & Decker, with the permission of the Court (Tr. 72-73), filed a Submission of Supplemental Case Law, which listed cases pertaining to pleadings,

---

[1]    On September 27, 2002, Black & Decker submitted fourteen volumes to the Court, comprised primarily of material which had been submitted previously.  This submission was captioned Compendium of Selected Black & Decker Summary Judgment Filings in Support of its Submission Pursuant to Scheduling Order Dated September 11, 2002, and included a covering memorandum and index. Unless otherwise noted, all references in this Memorandum are to certain of those volumes (Volumes 1, 7, 8, 9, and 10) or to an additional volume, Volume 10A, which is being submitted herewith.

Five volumes of the September 27, 2002 submission are pertinent to the Farrel/SHW claims.  Volumes 7 through 10 are directed specifically to Farrel/SHW.  Volume 7, the first of these four volumes, consists primarily of Black & Decker's pre-September 2002 briefs pertaining to these sites.  Volumes 8 through 10 contain pertinent exhibits.  Volume 1 includes material relevant to multiple sites including Ansonia and Derby.  The new Volume 10A includes the transcript of the July 10, 2003 hearing (as Item A), subsequent briefing (as Item B), an affidavit of Jeffrey J. Loureiro with exhibits (as Item C), excerpts from the deposition of Gregory D. Martin (as Item D), and dictionary excerpts (as Item E).

notice/prejudice, and sophisticated insureds.  On the same day, Liberty Mutual filed a nineteen page brief.  On July 18, Black & Decker moved to strike the Liberty Mutual brief and, in the alternative, requested that the Court receive its attached Response to Liberty Mutual's July 17, 2003 Submission.  On July 21, 2003, Liberty Mutual filed a reply to Black & Decker's Response.  For the Court's convenience, copies of Black & Decker's Supplemental Submission and its Motion to Strike with Response are being submitted herewith in Vol. 10A, along with a transcript of the July 10, 2003 hearing, an affidavit with exhibits, excerpts from a deposition, and excerpts from various dictionaries.  See note 1, supra.

The parties disagree about whether there was an "accident" or "occurrence" under the respective policies, whether the underlying claims fall outside of the owned property exclusion, and whether the one-year reporting requirement, a forfeiture clause, is applicable.  Issues may also remain regarding notice and, possibly, tender of the claims.

Black & Decker believes some further briefing on each of these issues would be useful to the Court.  Primarily, Black & Decker seeks to address further questions raised by the Court or discussed by the parties during argument.  In addition, Black & Decker refers the Court to a small number of cases decided since the 1998 briefing.

Much of this Memorandum is devoted to the issue of the owned property exclusion.  Among other things, Black & Decker shows that Connecticut's statutory scheme, which includes a water diversion law and a declaration of trusteeship, demonstrates that groundwater is not owned property in Connecticut.  To support this

argument, Black & Decker shows that other states, which treat groundwater as Connecticut does, deem groundwater non-owned property for purposes of the owned property exclusion. Black & Decker also further develops other arguments regarding the owned property exclusion.

The second section of the Memorandum deals with notice issues, including the one-year reporting requirement, and briefly updates the law of tender. The next section briefly references "accident defined" and "occurrence" issues. There is a final short section on waiver.

In this and prior briefing and arguments, and based upon the record before the Court, Black & Decker has shown it is entitled to summary judgment on the duty to defend and on the duty to indemnify. It also has shown that Liberty Mutual's motion for summary judgment should be denied since, at a minimum, fact issues remain for trial.

## II.    OWNED PROPERTY EXCLUSION INAPPLICABLE

Black & Decker previously showed that groundwater in Connecticut is not owned by the overlying landowner. It also showed that, regardless of the status of Connecticut's groundwater, Connecticut would adopt the rule set down in Allstate Ins. Co. v. Quinn Constr. Co. 713 F.Supp. 35, 41 (D.Mass. 1989), vacated as a result of settlement, 784 F.Supp. 927 (D.Mass. 1990) and other cases, which hold that the exclusion is inapplicable if contamination on owned property presents "a demonstrated danger to the property of another," and/or the rule of Patz v. St. Paul Fire & Marine Ins. Co., 15 F.3d 699, 705 (7th Cir. 1994), which applies, under a nuisance theory, to cleanups to comply with applicable environmental laws. See Nov. 1998 Mem. at 55-67 and Dec. 1998 Mem. at 13-14. This Memorandum updates and supplements those points.

A.      Groundwater Is Not "Owned Property" In Connecticut

The underlying complaints specifically allege groundwater contamination (Vol. 8 at XXXIV:031, XXXIV:038, XXXIV:090).[2]   As groundwater is non-owned property in Connecticut, and particularly here, where there is a flow off-site, Liberty Mutual had a duty to defend and, under Missionaries of the Company of Mary, Inc. v. Aetna Casualty and Surety Co., 230 A.2d 21, 24-26 (Conn. 1967), its failure to defend requires it to indemnify Black & Decker.  The applicability of Missionaries is further discussed in Nov. 1998 Mem. at 26-33 and Dec. 1998 Mem. at 6-8.  If the duty to indemnify were considered on the merits, the record shows actual groundwater contamination at both the Ansonia and Derby sites, as well as a flow of groundwater off-site.  See Vol. 10A at C, Affidavit of Jeffrey J. Loureiro ("Loureiro Aff."), ¶¶ 12, 17, 18.

As discussed in previous briefing, a Connecticut trial court, applying Connecticut law, held in R.E.O., Inc. v. Travelers Cos., 1998 WL 285836 (Conn. Super. 1998), that allegations encompassing contamination of "waters of the state" were sufficient to remove the claim from the ambit of an owned property exclusion, citing out-of-state cases premised on groundwater contamination.  Applying general principles of law, the federal district court concluded that groundwater was non-owned property in United Technologies Corp. v. American Home Assurance Co., 989 F.Supp. 128, 145-47 (D. Conn. 1997).  See Nov. 1998 Mem. at 56-59.  In addition, in Starr v. Commissioner of Environmental Protection, 627 A.2d 1296, 1306-1310 (Conn. 1993), Connecticut's highest court, after reviewing the legislative history of the Connecticut Water Pollution

---

[2]   A subsequent Farrel state law complaint and the Farrel federal law complaints include the more general allegation of releases into the environment from the Ansonia and Derby Plants, which raise the possibility or potentiality of on-site or off-site groundwater contamination (Vol. 8 at XXXIV:050, XXXIV:063-064; Vol. 10 at RApp-108).

Control Act, C.G.S.A. §§ 22a-416 through 22a-484, interpreted the act as including a "declaration of the public ownership of all water" in the state. See Nov. 1998 Mem. at 59-60. The breadth of that statute was subsequently reiterated in BEC Corp. v. Department of Environmental Protection, 775 A.2d 928, 938-940 (Conn. 2001), where corporate officers were held personally liable under that statute.

As is shown below, other Connecticut statutes and materials further demonstrate that groundwater is not "owned property" in Connecticut. Accordingly, Liberty Mutual cannot rely upon the owned property exclusion to avoid either its duty to defend or its duty to indemnify.

1.    The Connecticut Water Diversion Policy Act

Ownership of groundwater is governed by statute in Connecticut. The Connecticut Water Diversion Policy Act, C.G.S.A. §§ 22a-365 through 22a-380 ("Diversion Act"), sets up an administrative scheme to allocate state waters, including groundwater. Connecticut's highest court has concluded that prior common law rules governing water rights were no longer in effect as a result of this legislation. City of Waterbury v. Town of Washington, 800 A.2d 1102, 1149-50 (Conn. 2002).

Under the Diversion Act, "waters" are defined as "all tidal waters, harbors, estuaries, rivers, brooks, watercourses, waterways, wells, springs, lakes, ponds, marshes, drainage systems and all other surface or underground streams, bodies or accumulations of water, natural or artificial, pubic or private, which are contained within, flow through or border upon this state or any portion thereof." C.G.S.A. §22a-367(9). This definition encompasses groundwater. See Regulations of Connecticut State Agencies, §§22a-377(c)-1(a)(1). The statute includes a "grandfather" clause, under which those diverting

- 5 -

water prior to July 1, 1982, can register their diversions and such registered water is not subject to the permitting process. C.G.S.A. §22a-368. After July 1, 1982, "no person or municipality shall … commence to divert water from the waters of the state without first obtaining a permit for such diversion from the commissioner."[3] Id. Factors to be considered in the permitting process include"[t]he effect of the proposed diversion on related needs for public water supply, including existing and projected uses, safe yield of reservoir systems and reservoir and groundwater development" and "[t]he effect of the proposed diversion on the existing water conditions, with due regard to watershed characterization, groundwater availability potential, evapotranspiration conditions and water quality." C.G.S.A. §22a-373. The permit application must include a statement of the "effect" of the diversion, "alternatives" to it, and "conservation measures" planned and in place. C.G.S.A. §22a-369. An administrative procedure for consideration of permit applications is established and $1,000-per-day fines may be imposed for violations. See generally §22a 365 et seq.

In City of Waterbury, supra, a case concerning Waterbury's right to dam and withdraw water from a river, the Connecticut Supreme Court discussed the import of this statute with respect to common law riparian rights. Although Waterbury's registration and subsequent permits under the Diversion Act were not directly at issue, its rights as a riparian owner were relevant. In discussing these riparian rights, the court stated that the "diversion act … transformed the state into a 'regulated riparian' jurisdiction" whereas, previously, "Connecticut subscribed to the natural flow theory of riparian water rights" under common law. 800 A.2d at 1149-50 and n. 44. While the

---

[3]    Under C.G.S.A. §22a-377 certain diversions are exempt from the registration and permitting process, including users diverting fewer than 50,000 gallons a day.

impact of the statute on rights to groundwater was not directly at issue, the Diversion Act treats flowing water and groundwater in identical fashion.  Accordingly, except possibly with respect to the "grandfathered" registered water, a landowner's rights to the groundwater beneath its property, like the rights of a  riparian owner, are no longer controlled by common law.

The  Connecticut  Attorney  General  has  discussed  the  import  of  the Diversion Act in a formal opinion:

> The legislative findings contained in Conn. Gen. Stat. § 22a-366 indicate that the holders of diversion permits granted pursuant to §22a-368 et seq. have been accorded a limited right that is subordinate to numerous public considerations.  This right derives from the express permission of the state, as evidenced by the permit, and is subject both to periodic investigations, see § 22a-375, and to the emergency  suspension provisions of § 22a-378. The  application and hearing   requirements established by the Water Diversion Policy Act make clear that permits are issued only at the discretion of the Commissioner of Environmental Protection, and only after his evaluation of the factors specified in §22a-373.

1986 Conn. Op. Atty. Gen. 80.

The Diversion Act includes legislative findings, which were referenced by the Attorney General, as well as a water resources policy statement.  See C.G.S.A. §22a-366 and §22a-380.  The findings recognize "the waters of Connecticut are a precious, finite and invaluable resource" and declare "that diversion of the waters of the state shall be permitted only when such diversion is found to be necessary [and] is compatible with long-range water resource planning, proper management and use of the water resources of Connecticut."  The policy statement declares, as the goals and policies of the state, "[t]o preserve and protect water supply watershed lands and prevent degradation of surface water and groundwaters," to promote conservation, to prevent contamination, and

"to balance competing and conflicting needs for water equitably and at a reasonable cost to all citizens."

In Connecticut the right to water, including groundwater, depends, not upon access due to landownership but, rather, upon various societal goals. To be sure, water users may rely upon the "grandfather clause" or certain exemptions. However, the water itself, and certainly groundwater, at least prior to diversion, belongs to the public - not the owner of the surface land. Connecticut law is totally incompatible with the notion that a landowner has an absolute ownership interest in the groundwater beneath its property.

2.      Declaration Of Public Trust In Water

Any argument that Connecticut's groundwater is "owned property" for purposes of the policy exclusion at issue is further undermined by Connecticut's Environmental Protection Act of 1971, C.G.S.A. §§22a-14 through 22a-20. Here, the Connecticut legislature "found and declared that there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same." C.G.S.A. §22a-15. Further finding that "it is in the public interest to provide all persons with an adequate remedy to protect the air, water and other natural resources from unreasonable pollution, impairment or destruction," the legislature provided that any person could either intervene in an administrative proceeding or bring a declaratory judgment action "for the protection" of such public trust. C.G.S.A. §§22a-15, 22a-16, and 22a-19.

In construing the term "natural resources," Connecticut's Supreme Court pointed out that "[a]ir and water are natural resources that are not, generally speaking,

'owned' by anyone." <u>Red Hill Coalition, Inc.</u> v. <u>Town Plan and Zoning Commission of the Town of Glastonbury</u>, 563 A.2d 1347, 1352, n. 9 (Conn. 1989).  During passage of the statute, the deputy majority leader "explained that it would expand 'the right of a person to have access to the courts when property which we might say belongs to all of the public is jeopardized by the alleged polluting activity.'"  He went on to state that "'some of the most beautiful aspects of our environment, some of those most vital not only to our survival, but to that of future generations are such that they do not lend themselves to a proprietary or a personal interest and this bill makes the guaranteeing and the preservation and the protection of these rights available to the general public which they are not presently under our law.'"  See <u>Paige</u> v. <u>Town Plan and Zoning Commission of the Town of Fairfield</u>, 668 A.2d 340, 459-60 (Conn. 1995).  While, as in <u>Red Hill</u> and <u>Paige</u>, the reach of the term "natural resources" may be debated, there can be no doubt that "water" was encompassed in the description of that which "belongs to all of the public."  This declaration of a "public trust" in Connecticut's waters, whether considered alone or in conjunction with Diversion Act and the <u>Starr</u> Court's construction of the Connecticut Water Pollution Control Act, compels the conclusion that, in Connecticut, groundwater is not owned property.

     3.     Groundwater Is Not "Owned Property" In Other States
               <u>With Comparable Provisions Regarding Groundwater</u>

     a.     <u>"Reasonable Use" States</u>

A number of states, either through legislation or as a matter of common law, have adopted a "reasonable use," or American, rule applicable to groundwater.  The "reasonable use" rule places fewer limitations on groundwater usage than Connecticut's Diversion Act.  It "does not forbid the use of the percolating water for all purposes

properly connected with the use, enjoyment and development of the land itself, but it does forbid maliciously cutting it off, its unnecessary waste, or withdrawal for sale or distribution for uses not connected with the beneficial enjoyment or ownership of the land from which it is taken." Clinchfield Coal Corp. v. Compton, 139 S.E. 308, 313 (Va. 1927); also see Restatement (Second) Torts ("Restatement"), Introductory Note to Division 10, Chapter 41, Topic 4, discussing the various common law rules regarding groundwater. In contrast, Connecticut's permit system rests on a panoply of societal factors and clearly permits transport of groundwater away from the overlying land for purposes unrelated to that land, such as the supply of water to a distant city. [4] Since, as shown below, groundwater is non-owned property in "reasonable use" jurisdictions, groundwater is non-owned property in Connecticut as well.

Illinois became a "reasonable use" state by statute. See Illinois Water Use Act of 1983, 525 Ill.C.S. §45/1 et seq. and especially §45/6. "These provisions clearly state that the rule of reasonableness shall apply to groundwater withdrawals, thereby supplanting the rule of absolute ownership of groundwater." Bridgman v. Sanitary District of Decatur, 517 N.E.2d 309, 314 (Ill. App. 1987). In Cargill, Inc. v. Evanston Ins. Co., 642 N.W.2d 80, 90 (Minn. 2002), the court, applying Illinois law, found an owned property exclusion inapplicable because, under the Illinois Water Use Act, "groundwater is … considered part of the public domain."

Missouri adopted the "reasonable use" rule as a matter of common law. Higday v. Nickolaus, 469 S.W.2d 859, 869-70 (Mo. App. 1971). In United States v.

---

[4]    The "reasonable use," or American, rule "came into being with the invention of the high capacity pump, when cities bought land or easements for well fields in the country and lowered the water table beyond the reach of the domestic wells of neighboring farmers." Introductory Note to Restatement, supra.

Conservation Chemical Co., 653 F.Supp. 152, 200 (W.D.Mo. 1986), the court rejected the insurers' contention "that the identified proprietary interest in the reasonable use of underground water is an ownership interest sufficient to support application of the owned property exclusion." Citing to Higday, it held that groundwater was not owned-property in Missouri for purposes of the owned property exclusion.

One of the out-of-state cases cited by the Conservation Chemical Court was United States Aviex Co. v. Travelers Ins. Co. 336 N.W.2d 838, 843 (Mich. App. 1983). Relying on Schenk v. City of Ann Arbor, 163 N.W. 109 (1917), which adopted "a rule known as 'reasonable use,'" it held that "percolating water is not owned by the owner of the land under which it flows and so does not fit within the policy's exclusion."

Some states have gone further than the "reasonable use" states. For example, Wisconsin adopted a rule set forth in a Tentative Draft of the Restatement. As described by the commentators, the rule would give "the protection of the American rule [i.e., the "reasonable use" rule] to owners of small wells harmed by large withdrawals for use elsewhere, but extends that protection in proper cases to harm done by large withdrawals for operations on overlying lands." See State of Wisconsin v. Michels Pipeline Construction, Inc., 217 N.W.2d 339, 350, supplemented on rehearing, 219 N.W.2d 308 (Wis. 1974). This rule is consistent with Connecticut's permit system, where large withdrawals are subject to permit, the diversion must be compatible with "proper management," and "groundwater availability potential" is a factor in the grant of permits. See C.G.S.A. §22a-366 and §22a-373. Relying on Michels, the federal court in Maryland Cas. Co. v. Wausau Chemical Corp., 809 F.Supp. 680, 693 (W.D.Wis. 1992), rejected an "owned property" exclusion defense.

As these cases show, the owned property exclusion does not apply where states have departed, even in small measure, from an absolute ownership rule. Connecticut's departure, which is at least as great and probably greater than that of Illinois, Missouri, Michigan, and Wisconsin, warrants the same result.

       b.      <u>New York, A Trusteeship State</u>

As discussed above, Connecticut has declared a public trust in the waters of the state. New York has done the same. Its legislature declared "that the state is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction," with "natural resources" defined to include "waters" and "waters" defined to include "bodies of surface or groundwater." McKinney's Navigation Law, §§ 170, 172(12), (18). Citing these provisions, a New York court held that, "since groundwater is a natural resource … protected by plaintiff [New York] as a trustee for its people," the damage was "to property other than that of the insured." <u>State of New York</u> v. <u>New York Central Mutual Fire Ins. Co.</u>, 542 N.Y.S.2d 402, 403-404 (App. Div. 1989).

As in New York, Connecticut's statutory declaration of trusteeship removes groundwater from the category of owned-property for purposes of the owned property exclusion. This conclusion is reinforced when the impact of this declaration of trusteeship, which <u>Red Hill</u> construed as meaning that state waters were not "owned by anyone," is coupled with Connecticut's Diversion Act, which <u>City of Waterbury</u> recognized as a statutory replacement of common law principles, and with Connecticut's pollution control statutes, which <u>Starr</u> construed as a declaration of "public ownership" of the state's water. Thus, there is an exceptionally sound basis for holding that groundwater is not "owned property" in Connecticut.

B.    Non-Owned Property Is Contaminated And/Or
      Threatened At The Ansonia And Derby Sites__

As Black & Decker showed in its Nov. 1998 Mem. at 61-62, Connecticut would likely follow Quinn, supra, and other cases, adopting the rule that an owned property exclusion "does not bar recovery of the costs of cleaning up environmental contamination which presented a demonstrated danger to the property of another." 713 F.Supp. at 41. Since Connecticut groundwater is non-owned property, the Quinn rationale requires a defense and indemnification where on-site groundwater is threatened by soil contamination. Even if groundwater were "owned property" in Connecticut, contamination on the sites which migrates to, or threatens to migrate to, the Naugatuck River or other third party property removes the claims from the ambit of the owned-property exclusion.

1.    The Duty To Defend Under The Quinn Rationale

As noted, supra, at page 4, the allegations of the Farrel and SHW complaints filed in state court allege groundwater contamination. For purposes of the duty to defend, allegations of groundwater contamination beneath an insured's facility are sufficient to raise the possibility of actual or threatened off-site contamination. See Colonial Tanning Corp. v. Home Indemnity Co., 780 F.Supp. 906, 926 (N.D.N.Y. 1991); also see REO, supra, 1998 WL 285836 at *8 and cases cited therein. When the Farrel litigation was continued in federal court, the Farrel federal complaints alleged releases of contaminants "into the environment from the Ansonia and the Derby" plants or premises, without further specification of where in the "environment" the contaminants could be found (Vol. 8 at XXXIV:050; XXXIV:063-064). Farrel also amended its state law complaint to allege "release[s] into the environment from the Ansonia and the Derby

Premises" and "further contaminat[ion of] the environment" (Vol. 8 at RApp. 108). These allegations are sufficient to raise a "possibility" or "potentiality" that non-owned property is threatened or actually contaminated. (Connecticut's "possibility" or "potentiality" standard is discussed in the Nov. 1998 Mem. at 22-23). Accordingly, regardless of whether groundwater is owned property in Connecticut, the allegations are sufficient to require Liberty Mutual to defend.

> 2.    The Duty To Indemnify Under The Quinn Rationale.

Under <u>Missionaries</u>, 230 A.2d at 24-26, Liberty Mutual's breach of its duty to defend requires it to indemnify as well. However, in the event that the Court considers Liberty Mutual's duty to indemnify on the merits, and, further, that the Court looks to the <u>Quinn</u> rationale, the record clearly shows that, at a minimum, fact questions remain which preclude any grant of summary judgment to Liberty Mutual based upon the owned property exclusion. There is evidence that, at the very least, on-site groundwater, off-site groundwater, and off-site surface water all are either contaminated or threatened with contamination. Loureiro Aff. ¶¶ 7, 8, 12, 17, 18; also see references cited in Nov. 1998 Mem. at 64-65.

It is uncontroverted that, under the settlements reached in the underlying cases, the remediation requirements imposed by Connecticut law are the primary driver behind the remediation costs at the Ansonia and Derby sites. See Vol. 8 at XXXIV:246. Connecticut has administratively established certain parameters which must be met by remediation of a contaminated site. See Loureiro Aff. ¶¶ 3, 4, and 6. As shown below, remediation here is driven by state regulatory criteria which address actual or threatened

groundwater contamination.  Groundwater from the Ansonia and Derby sites flows into adjacent land or to the abutting or nearby rivers.

           a.      <u>The Connecticut Regulatory Framework</u>

        The applicable state regulations are set forth in the Regulations of Connecticut State Agencies, §22a-133k-1 et seq.  Standards for soil remediation appear at §22a-133k-2;  standards for groundwater remediation appear at §22a-133k-3.  However, as the regulations make clear, criteria applicable to one medium sometimes are intended to prevent substances from being transmitted to a different medium.

        There are two primary sets of criteria applicable to soil remediation. These are Direct Exposure Criteria and Pollutant Mobility Criteria.  The aim of Direct Exposure Criteria is to protect persons on the site who may come in direct contact with the soil.  In contrast, Pollutant Mobility Criteria, as the name suggests, is <u>soil</u> remediation intended to protect <u>groundwater</u> from mobile pollutants which threaten to move from the soil to the groundwater.  These criteria "are intended to protect groundwater from levels of contaminants in soil that pose a risk of migration into the groundwater."  See Vol. 10A at C, Loureiro Aff. ¶ 9.  Liberty Mutual's expert, Gregory D. Martin, agrees that components of the soil standards are "intended to be protective of groundwater quality." Vol. 10A at D, Martin Deposition dated October 27, 2003 ("Martin Dep.") at 128.  When, as at Ansonia and Derby, groundwater is designated GB, <u>i.e.</u>, for industrial use, the regulations "are intended to protect the groundwater beneath and beyond the property by preventing further groundwater contamination and, ultimately, improving groundwater quality."  Loureiro Aff. ¶ 9;  also see Nov. Mem. at 65-66.

Where the groundwater itself already is contaminated, criteria applicable to groundwater remediation include Surface-Water Protection Criteria and Volatilization Criteria. See §22a-133k-3. Volatilization criteria, like the direct exposure criteria for soil, deal with danger to those using the property, e.g., from breathing dangerous fumes. However, the Surface-Water Protection Criteria address migration of contaminants from groundwater to surface waters, such as rivers and lakes. See §22a-133k-3(b)(1); also see Loureiro Aff. at ¶ 11.

      b.      <u>Remediation Protects Rivers And Other Non-Owned Property</u>

Jeffrey Loureiro, a registered professional engineer involved with site remediation in Ansonia and Derby who also served on drafting committees for the state regulations (Loureiro Aff. ¶¶ 1-6), explains the nexus between the Connecticut regulations and the remediation at the sites. Mr. Loureiro states that a considerable portion of the present, or anticipated, remedial work at the Ansonia and Derby Sites is being driven by the Pollutant Mobility Criteria. Loureiro Aff. ¶ 10. These criteria are performance based, so that Mr. Loureiro, as a Licensed Environmental Professional, can select remedies appropriate to meeting the state-mandated criteria. <u>Id</u>. at ¶¶ 2, 3, 10. Remedies being implemented at the Ansonia and Derby sites include soil excavation and engineered controls, such as caps. <u>Id</u>. at ¶ 10.

At both sites, contaminants, including PCE, have migrated from the soil to the groundwater. The groundwater at each site is contaminated. Loureiro Aff. ¶ 12. By remediation, including excavation and/or engineered controls directed to contaminated soils, Mr. Loureiro anticipates that contaminants will be removed from the soils to achieve compliance with the Pollutant Mobility Criteria and, where applicable, to achieve

- 16 -

compliance with the Surface-Water Protection Criteria as well.  Id. at ¶¶ 13, 14.  The present and planned remediation is intended to prevent further contaminants from entering the groundwater and to obviate the need to remediate the groundwater directly. Id.  All the remedial work at specific areas of each site, as well as certain of the work at other specified areas of each site, has been untaken, or is expected to be undertaken, to satisfy the Pollutant Mobility Criteria and, accordingly, to address groundwater contamination.  See Loureiro Aff. ¶¶ 15, 16 and attached drawings.[5]

Liberty Mutual's expert agrees that "soil vapor extraction and the capping were intended to meet remedial goals," as set forth in the Connecticut regulations.  Vol. 10A at D,  Martin Dep. at 111.  He also agrees that capping "may reduce the potential for future groundwater impact … by preventing percolation of water through soil …" Id. at 110.  Similarly, he testified that excavation  may reduce the potential for groundwater contamination because the contamination in the soil is "no longer available to migrate" to the groundwater.  Id. at 150.  Mr. Martin  acknowledged the presence of groundwater contamination at both Ansonia and Derby.  Id. at 113-14, 141-42.

Groundwater beneath the Ansonia site flows directly into the Naugatuck River.  Loureiro Aff. ¶ 7.  Groundwater beneath the Derby site flows beyond the site beneath third party property, including Connecticut Route 8, and into the Naugatuck and Housatonic Rivers at the confluence of those rivers.  Id. at ¶ 8.  Liberty Mutual's expert acknowledges that groundwater flows to these rivers.  Martin Dep. at 157-58. Contaminants at the Ansonia site have already entered the river.  Loureiro Aff. ¶ 17.

---

[5]    Drawing 1 of Proposed Site Remediation Areas Site Wide, dated April, 2003, referenced in Loureiro Aff. ¶15, pertains to Ansonia.  Drawings 3-5 of the Phase IV Site Remediation Report dated March 4, 2002, referenced in Loureiro Aff. ¶16, pertain to Derby.

Work at the Ansonia site "performed to date .. . has eliminated exceedances of applicable PMC [Pollutant Mobility Criteria] at certain portions of the site" but further remedial work will be required to achieve "compliance with the applicable PMC at other portions of the Ansonia Site and to achieve compliance with the applicable SWPC [Surface-Water Protection Criteria]." Loureiro Aff. ¶ 17. As Mr. Loureiro states, "[i]n the absence of the remedial work at the Ansonia Site that was undertaken to achieve compliance with the applicable PMC, and that will be undertaken to achieve compliance with the applicable PMC and SWPC, there is a likelihood that contaminants in groundwater, which have entered the Naugatuck River, would continue to enter that river." Loureiro Aff. ¶ 17. He deems the likelihood "particularly great with respect to the areas on the Ansonia Site that have required the most extensive remediation." Id. Documents relating to the SHW remediation confirm groundwater contamination flowing toward the Naugatuck River and threatening to reach non-owned property. See Nov. 1998 Mem. at 65-66.

At Derby, "remedial work … has achieved compliance with the applicable PMC." Loureiro Aff. ¶ 18. However, "[i]n the absence of remedial work at the Derby Site that was undertaken to achieve compliance with the PMC, contaminated groundwater would have continued to move beyond the property line of the Derby Site to property of third parties." Id. Again, "this is particularly the case with respect to the areas on the Derby Site that have required the most extensive remediation." Id.

Thus, the record shows groundwater contamination and, at least at Ansonia, contamination which has reached the Naugatuck River. At both sites, in the absence of remediation, additional groundwater contamination was threatened as was off-

site contamination. The off-site contamination at Ansonia is directly to the Naugatuck River. The off-site contamination at Derby is to off-site groundwater and then the rivers. At a minimum, a substantial question of material fact remains as to whether groundwater and/or off-site property is contaminated or is, or was, threatened with contamination. Accordingly, under the rationale of Quinn, Liberty Mutual cannot rely upon the owned property exclusion in its quest for summary judgment.

> C.    Costs To Comply With State-Imposed Standards
>        Fall Outside The Owned Property Exclusion____

As discussed in the Nov. 1998 Mem. at 62-64, costs to comply with state-imposed standards also fall outside the owned property exclusion, under principles set down in cases such as Patz, supa. There, the court pointed out that the insureds are seeking "to recover the cost … imposed on them for maintaining a nuisance." 15 F.3d at 705. The Patz approach is in tune with that of Connecticut. Connecticut's highest court views the state's pollution control laws as "intended to track and incorporate the common law of public nuisance." Starr, supra, 627 A.2d at 1309-10. As early as 1936 Connecticut applied nuisance principles to deal with water contamination. See Swift & Co. v. Peoples Coal & Oil Co., 186 A. 629 (Conn. 1936), discussed in Nov. 1989 Mem. at 60-61. The regulations, outlined above, carry out this intent. As shown, a principal purpose of Connecticut's regulatory scheme is to prevent the spread of contamination from a contaminated site. Another aim is the prevention of human injury due to contact with contaminated soil or fumes.

The Patz approach meshes well with Connecticut's public policy regarding nuisance, as evidenced in the common law enunciated in Swift, in the discussion of the rationale behind the statutory enactments in Starr, and in the regulations carrying out the

statutory enactments themselves. The issue is not so much contamination per se as a clear linkage to actual or potential third-party damage, actual or threatened damage to public property, or actual or potential injury to individuals. All costs incurred to satisfy the various criteria in Connecticut's regulations are costs which fall outside of the owned-property exclusion under cases such as Patz.

Whether viewed separately or in tandem, Quinn, Patz, and the laws relating to groundwater in Connecticut take these claims outside of the owned-property exclusion. Liberty Mutual cannot rely upon that exclusion either to defeat Black & Decker's motion or to support its own motion. The underlying allegations require a defense and, under Missionaries, indemnification. At the very least, fact-questions remain, precluding summary judgment for Liberty Mutual on this issue.

III.    THERE ARE FURTHER BASES FOR DENYING NOTICE, ONE-YEAR REPORTING, AND TENDER DEFENSES____

A.    Timeliness And Sufficiency Of Notice

Black & Decker filed its Supplemental Submission Regarding The Newly Raised Issues Of Tender And Notice/Prejudice on January 7, 1999, with four additional exhibits including correspondence with Liberty Mutual and pertinent Liberty Mutual claims files ("Notice Brief"). See Vol. 7. A chronology at pages 2-4 of the Notice Brief catalogues the various complaints and amended complaints in the underlying actions, as well as communications between Black & Decker and Liberty Mutual and between Aetna and Liberty Mutual. Liberty Mutual's opportunities to defend prior to settlement are further discussed in Dec. Mem. at 5-6. In sum, the SHW complaint and Farrel's first amended state court complaint were forwarded to Liberty Mutual on January 10, 1990 (Vol 8 at App. XXXIV:085). Aetna, in an effort to gain cooperation from Liberty Mutual

regarding the defense of claims against their respective insureds, forwarded materials, including Farrel's second amended state court complaint and Farrel's federal court complaint, to Liberty Mutual on July 15, 1993 (Vol. 10 at RApp:037-045). Liberty Mutual denied coverage on June 14, 1994, referencing the SHW complaint, which Black & Decker had sent to it in January 1990, and the Farrel second amended state court complaint, which Aetna had forwarded to it in July 1993 (Vol. 8 at App. XXXIV:215-220 and especially page 216). These communications were all prior to settlement of either the SHW or Farrel claim.[6]

Previously, Liberty Mutual argued that notice of Farrel's federal court suit was deficient. Black & Decker showed in the Notice Brief that Liberty Mutual had 1) constructive notice in 1990, when it was informed of the Farrel state court action and failed to keep itself apprised of the course of the litigation including the stay in favor of the federal suit; 2) actual notice via the Aetna communication in 1993, and 3) actual pre-settlement notice in 1994. See Notice Brief at 7-15.

1.    Pleading Issue

During oral argument in July 2003, counsel for Liberty Mutual argued that the underlying complaints sought recovery for "breach of contract for fraud, for misrepresentation, for deceit," indicating that, in some way, Liberty Mutual was not apprised of the underlying plaintiffs' garden-variety environmental claims (Vol. 10A at A, Tr. 40-41). In colloquy the Court stated its view that, in comparing the underlying complaints to the insurance policies in order to determine the duty to defend, the Court

---

[6]    Even after settlement with Farrel, Liberty Mutual had ample opportunity to protect itself since the ultimate cost of the settlement would not be determined until long after the settlement agreement was executed. See Vol. 8 at XXXIV:246

must look at "the underlying facts" rather than the way in which the underlying plaintiff "styles the case." (Tr. at 42). There is strong support in Connecticut law for that approach.

In Shareamerica, Inc. v. Ernst & Young, 1999 WL 545417 at *5 (Conn. Super. 1989),[7] a defendant challenged the legal sufficiency of a count in a complaint captioned "tort." After pointing out that Connecticut's rules of procedure do not require, or even mention, use of captions in pleadings, it concluded that it must "look beyond [the] caption to the allegations" to determine whether the plaintiff had stated a claim. Since the allegations supported a claim for breach of the covenant of good faith and fair dealing, the count was legally sufficient.

Connecticut's Supreme Court also has looked beyond the language of a pleading to discern the nature of a claim. In Travelers Ins. Co. v. Namerow, 807 A.2d 467 (Conn. 2002), the court explained that pleadings must be construed "broadly and realistically, rather than narrowly and technically," that a complaint "must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded …," and that the test is whether "the pleadings provide sufficient notice of the facts claimed and the issues to be tried …" 807 A.2d at 474. In that case, the insurer argued that, when it alleged that coverage of property destroyed by fire was barred by an exclusion for damage caused by an insured's intentional act, it was not relying upon an "arson defense." The court disagreed, pointing to allegations that the fire was "'incendiary in origin' and that the loss at issue was the result of defendants'

---

[7]    The cases discussed herein were called to the Court's attention, without discussion, in Black & Decker's Submission of Supplemental Case Law filed on July 17, 2003 (see Vol. 10A at B) and two were briefly referenced during the oral argument on July 10, 2003 (Tr. 66-69).

intentional act."  807 A.2d at 477.  It was immaterial that the word "arson" did not appear.

The court made the same point in <u>Burns</u> v. <u>Koellmer</u>, 527 A.2d 1210 (Conn. 1987).  There the trial court properly charged the jury on theories of unjust enrichment, quantum meruit, and implied contract even though those legal theories were never expressly identified.  Holding that the "complaint must be examined to determine whether she alleged these theories," the court concluded that allegations such as those regarding work done, expectations of future additional payment, and defendant's knowledge of these expectations were sufficient to permit recovery under the unidentified legal theories.  527 A.2d at 1214-15.  In <u>Veits</u> v. <u>City of Hartford</u>, 58 A.2d 389, 394 (Conn. 1948), the court explained that the number of counts was immaterial and that it had "approved the use of a single count to set forth the basis of a plaintiff's claims for relief where they grow out of a single occurrence or transaction or closely related occurrences or transactions, and it does not matter that the claims for relief do not have the same legal basis"

However, there really is no need to reach this "pleading" issue which Liberty Mutual is attempting to raise.  Here, Liberty Mutual had had the SHW complaint since 1990, in which the plaintiff made a claim under C.G.S.A. §22a-452, seeking reimbursement for costs of remediating contamination at the site (Vol. 8 at App. XXXIV:094-95).  That statute provides for reimbursement from a person where the contamination "resulted from the negligence or other actions of such person …"  A reasonable liability insurer would recognize the potentiality of coverage where damage may have resulted from the negligence of an insured.  The Farrel first amended state

court complaint, while not referencing that statute, obviously related to the same set of facts since, at least in part, the claim relied upon contamination at the same premises (compare Farrel allegation, Vol. 8 at App. XXXIV:037, referring to premises of "USM's Farrel Division located in Ansonia, Connecticut," and SHW allegation, Vol. 8 at App. XXXIV:087, referring to premises of "USM's Farrel Division located in Ansonia, Connecticut"). Both complaints were forwarded by Black & Decker to Liberty Mutual at the same time in January 1990 (Vol. 8 at App. XXXIV:085). Moreover, when Liberty Mutual denied coverage of the claims, its denial specifically pertained to the Farrel second amended state court complaint, which, like the SHW complaint, relied upon C.G.S.A. §22a-452 (see Vol. 10 at RApp. 114 for complaint and Vol. 8 at App. XXXIV:216 for denial letter). (Liberty Mutual also had, but did not reference, the Farrel federal court complaint, which included CERCLA claims (see XXXIV:053-055). As noted above, this was one of the documents forwarded to it by Aetna along with the Farrel second amended state court complaint.)

In R.C. Bigelow, Inc. v. Liberty Mutual Ins. Co., 287 F.3d 242, 246-49 (2d Cir. 2002), the Second Circuit, applying Connecticut law, adopted a practical approach to the determination of what an insurer knew or should have known. The insured had provided the insurer with a complaint, including attachments, and an amended complaint. Coverage of the claims of the amended complaint was denied. The court held that the insurer was on notice of the attachments, consisting of advertisements showing allegedly infringing packaging. Accordingly, the insurer should have recognized that the advertising injury count in the amended complaint encompassed a trade dress claim, which was covered, as well as an excluded claim.

Here, based on the pleadings before it, Liberty Mutual should have known it was being asked to defend a garden-variety environmental claim.  The denial letter itself shows that Liberty Mutual did know this.  Among other things, Liberty Mutual states that "expenses incurred for investigation, assessment or remediation in compliance with environmental regulations do not qualify as legal damages because of property damage whether incurred directly by you or claimed by others as response costs under statutory authority" (Vol. 8 at App. XXXIV:219).  Liberty Mutual then goes on to rely upon the pollution exclusion and the outdated manifestation trigger.  Id.  Liberty Mutual had sufficient notice of the nature of the claims it was being asked to defend.  Also see Notice Brief at 19-20.

2.    Liberty Mutual Was Not Prejudiced

Black & Decker showed in the Notice Brief at 14-26 that Liberty Mutual was not prejudiced by any delay in its receipt of notice of the underlying Farrel and/or SHW claims.  As this Court pointed out at page 112 of its Memorandum and Order Regarding Summary Judgment of December 5, 2003 ("December Order"), regarding Liberty Mutual's claim of prejudice from alleged voluntary payments at the Bostik site, once Liberty Mutual received notice "it could have immediately asserted a vigorous defense against" the underlying claimants.  "To the extent that it did not, it cannot claim prejudice."

In Peck v. Public Service Mutual Ins. Co., 326 F.3d 330 (2d Cir.),[8] cert. denied, 124 S. Ct. 540 (2003), a case decided after prior briefing, the Second Circuit, applying Connecticut law,  confirmed that absence of prejudice can be proven by

---

[8]    Black & Decker referred the Court to Peck in its Supplemental Submission of July 17, 2003.  See Vol. 10A at B.

evidence that, even if an insurer had been given notice, the insurer would not have acted any differently. There an insured gave no notice to its insurer. However, the insurer received notice of the claim from the insurance broker of a co-defendant. 326 F.3d at 333-34. After a default judgment entered against the insured, the underlying plaintiff sued the insurer under a direct action statute. The trial court granted summary judgment to the insurer on notice grounds. The Second Circuit reversed and remanded, stating that fact questions remained.

Evidence from the claims file suggested that the insurer "was not ignorant of South Norwalk's involvement in the lawsuit." 326 F.3d at 339. In addition, there was "no evidence in the record that [the insurer] would have acted differently … if it had received the notice directly from South Norwalk, given the reasons [the insurer] gave for disclaiming coverage" of a second insured. Id. While the Second Circuit expressed no view as to how the prejudice issue should ultimately be resolved, it pointed out that the insurer, as the moving party on summary judgment, had the burden "to demonstrate the absence of a genuine issue of material fact on the material prejudice issue." Id.

Wisconsin's Supreme Court made the same point even more forcefully in Fireman's Fund Ins. Co. v. Bradley Corp., 660 N.W.2d 666, 682-85 (Wis. 2003), another recent case. There the court found no prejudice as a matter of law after the insurer's employee testified that "he would have denied a duty to defend on the exact same complaint even if he had been provided with notice only one month after the [underlying] lawsuit was filed." Liberty Mutual's actions here have the same effect. Liberty Mutual engaged in a perfunctory investigation and eventually denied coverage under the USM policies, relying upon defenses such as the manifestation trigger and the pollution

exclusion, which are Liberty Mutual's virtually automatic response to any environmental claim. The manifestation argument, now abandoned, rested upon an incorrect reading of the law. The pollution exclusion argument ignored pre-pollution exclusion events, which were clearly encompassed in the underlying complaints. The timing of notice was irrelevant to Liberty Mutual's failure to defend.

Peck and Fireman's further buttress Black & Decker's showing that, under the facts of the present case, the absence of prejudice bars Liberty Mutual's reliance upon notice to support its summary judgment motion.

       3.    Impact Of The Four Corners Rule

The general rule that, in Connecticut, the duty to defend is based upon the four-corners of the underlying pleading came up in the July 2003 argument, particularly with respect to corporate relationships (see Tr. at 50-51). As the Court recognized, it can look beyond the complaint under certain circumstances. Based on an "exhaustive review of relevant Connecticut law and the law of other jurisdictions," a Connecticut trial court concluded that "the exclusive pleading rule has never been used in Connecticut to defeat an insurer's duty to defend." Conway v. Travelers Casualty & Surety Co., 2000 WL 1918051 at * 11, 12 (Conn. Super. 2000). The purpose is to prevent insurers from "challenging the duty to defend" based upon extrinsic matter. Id. In Conway, where an exception to an exclusion covered salesmen, the court looked beyond the complaint to affidavits submitted by the insured. Here, Liberty Mutual was well aware of the corporate relationships, since it had issued policies to Farrel, to USM with Farrel as a named insured, and to USM in care of Emhart. Liberty Mutual's reliance upon feigned ignorance of Farrel's relationship to USM and Emhart is inexcusable.

B.    <u>The One-Year Reporting Clause Does Not Bar The Claims</u>

Liberty Mutual's unusual one-year reporting, or forfeiture, provision, discussed in the Nov. 1998 Mem. at 67-79 and in the Dec. 1998 Mem. at 14-15, is in the 1961-1966 policies but does not appear in subsequent policies, including subsequent policies with no pollution exclusion.  Black & Decker showed, in previous briefing, that the provision is inapplicable and unenforceable because:

- Connecticut would not enforce a forfeiture provision requiring notice of an unknown loss;

- the provision is a notice provision and there has been no prejudice;

- the policy should not be construed to eliminate coverage retroactively due to a change in insurers;

- the policy language is ambiguous and, when construed in the context of the policy as a whole, additional subsequent damage does not defeat coverage;

- the provision "amends" the policy (as opposed to "deleting" or "adding" to prior provisions) and Liberty Mutual's own documents describe the change as nominal and not "affect[ing] coverage," thereby leaving previous Unites States and Canadian coverage intact;  and

- concluding that this "nominal" change converted an "occurrence" policy into a "claims made" policy is contrary to the premium history and would violate public policy.

Black & Decker also showed that Textron, Inc. v. Liberty Mutual Ins. Co., 639 A.2d 1358 (R.I. 1994), the case upon which Liberty Mutual relies, was wrongly decided and was based upon an incomplete record, which excluded Liberty Mutual's own comment about the import of the provision and which did not show the premium history here that belies conversion to cheaper "claims made" coverage.  See Vol. 9, West Aff. at XCVIII.

Argument regarding this provision is set forth in the July 2003 transcript at pages 20-38.  During that argument, Liberty Mutual conceded that the provision at issue is a notice provision (Tr. 36), which, accordingly, is subject to the prejudice rule of Aetna Casualty and Surety Co. v. Murphy, 538 A.2d 219 (Conn. 1988).  However, characterizing it as a notice provision does not detract from its status as a forfeiture provision as well.  Counsel for Liberty Mutual also asserted that no court has found the provision ambiguous (Tr. 33), suggesting that there is only one possible construction of the policy.  Here, Liberty Mutual ignores Endicott Johnson Corp. v. Liberty Mutual Ins. Co., 928 F.Supp. 176 (N.D.N.Y. 1996), appeal dismissed, 116 F.2d 53 (2d Cir. 1997), discussed in the Nov. 1998 Mem. at 73-74, where the court interpreted a virtually identical clause in a way that was contrary to the later interpretation in Textron.  Compare policy provision at 928 F.Supp. at 179 with Vol. 8 at App. III:29.  Black & Decker respectfully requests that this Court either follow Endicott Johnson or find the provision is ambiguous and construe it in favor of Black & Decker.[9]

---

[9]    Cases discussing the applicability of the rule construing ambiguous policy terms in favor of sophisticated insureds are referenced in Vol. 10A at B, Submission of Supplemental Case Law at 2.

During argument, counsel for Liberty Mutual also suggested that, somehow, Connecticut was less liberal than Massachusetts in construing insurance policies in favor of an insured (Tr. 35).  That is not a fair statement of Connecticut law.  In Hartford Casualty Insurance Co. v. Litchfield Mutual Fire Insurance Co., 835 A.2d 91 (Conn. App. 2003), certification granted, 268 Conn. 912, 913 (2004), the court described, in detail, the principle of contra proferentem," explaining that "[t]his canon … is more rigorously applied in the context of insurance contracts than in other contracts."  Applying liberal rules

During argument counsel for Black & Decker stated that the provision applied only to geographic areas, i.e., areas outside the United States and Canada, not covered by the policy as originally written and, further, that use of the word "amended," in contrast to "deleted," "eliminated, "substituted," or "added," which appear elsewhere in the same endorsement, demonstrated that the original coverage for the United States and Canada remained intact (Tr. 20-33).   As the Court suggested (Tr. at 27-28), the "Worldwide Coverage" caption along with "other aspects of the writing" could be construed to indicate that "worldwide coverage" does not pertain to coverage in the United States.

As discussed at the hearing, the dictionary meaning of "amended" (especially as contrasted with "deleted and "added") also supports Black & Decker's position.   According to Black's Law Dictionary (6th ed.), West Publishing Co. (1990) at 80-81:[10]

- "Amend" is "To improve.  To change for the better by removing defects or faults.  To change, correct, revise."

- "Amendment" is "To change or modify for the better.  To alter by modification, deletion, or addition."

These definitions are consistent with those in Webster's Third New International Dictionary (Unabridged), Merriam-Webster, Inc. (1993) at 68, which include:

- "Amend" is "to put right" and "to alter (as a motion, bill, or law) formally by modification, deletion or addition"

---

of construction under which ambiguous provisions are construed in favor of the insured, Connecticut's highest court recently held that an exclusion referring to "the intoxication of any person" was inapplicable to a claim for injury in an automobile accident resulting from the "consumption of alcohol." Wentland v. American Equity Insurance Co., 840 A.2d 1158, 1163 (Conn. 2004).

[10]    Copies of the relevant pages of the referenced dictionaries are in Vol. 10A at E.

- "Amendment" is "act of amending esp. for the better: correction of a fault or faults: reformation …" and "the process of amending (as a motion, bill, act, or constitution …)."

Definitions in <u>Webster's</u> <u>New</u> <u>International</u> <u>Dictionary</u> (India Paper ed.), G. & C.

Merriam Company (1932) at 69, are in accord:

- "Amend" is "To reform, convert, or make better in condition or character …" and "To free (a thing or conduct) from fault or error …"

- "Amendment" is "An alteration or change for the better; correction of a fault or of faults …"

Thus, the dictionaries consistently define an "amendment" as an improvement.

The references to "modification, deletion or addition" in certain definitions also is particularly striking since the endorsement specifically "deletes, "eliminates," or "substitutes," "adds," and "amends." See App. III:028. Had Liberty Mutual intended to use "amended" to include all of these actions, it easily could have used the same word, "amended," to describe the effect of each of the endorsement terms on the original policy provisions. However, since some of the changes "added" and others "deleted," "eliminated," or "substituted," it is reasonable to infer that those "amended" were simply being "modified" to include new language as well as the original language. If so, the only way to harmonize the old and new language is to construe the new language as adding foreign coverage under the terms of the amendment, leaving the prior coverage for United States and Canadian claims intact. Liberty Mutual made an improvement by modification, with no effect on coverage of the underlying claims here.

C.    There Is No Tender Requirement

Black & Decker shows, in its Notice Brief at 5-7, that a tender rule was rejected by a federal court applying Connecticut law, that the case Liberty Mutual had

relied upon was reversed by the Illinois Supreme Court, and that other courts had also

rejected a tender requirement. Liberty Mutual has subsequently attempted to resurrect its

tender argument. Since Black & Decker's original briefing on the tender issue,

Minnesota's highest court has flatly rejected a tender requirement. See <u>Home Ins. Co</u>. v.

<u>National Union Fire Ins. of Pittsburgh</u>, 658 N.W.2d 522, 531-535 (Minn. 2003). Relying

upon out-of-state precedent and its own analysis, it concluded that "[o]nce an insurer

receives notice of a suit, it is responsible for defending the insured unless the insured

explicitly refuses the insurer an opportunity to defend." 658 N.W.2d at 533. There is no

reason to believe Connecticut would buck this clear trend and belatedly adopt an archaic

tender rule.

IV.    <u>"ACCIDENT DEFINED" OR "OCCURRENCE"</u>

During oral argument, Liberty Mutual argued that there was no "accident."

See Tr. 40-41. It ignores the provisions of the Liberty Mutual policies which defined

"accident" to include "continuous or repeated exposure to conditions." See, <u>e.g.</u>, Vol. 8 at

App. III:028. The "occurrence" policies issued also include similar language. The scope

of such policies is discussed in this Court's Memorandum and Order Regarding Summary

Judgment of December 5, 2003 at 38-40.

Relying on expert affidavits, Black & Decker shows in the Nov. 1998

Mem. at 37-55 that the damage at Farrel was not expected or intended by the insured or,

at the very least, that fact questions remained precluding summary judgment for Liberty

Mutual. Black & Decker also addressed this issue in the Dec. 1998 Mem. at 8-13. This

argument relied upon Connecticut decisions as well as out-of-state cases. For further

discussion, see Vol. 1 at B and C. The damage, as opposed to the act, must be

intentional, and intent should be determined subjectively from the standpoint of the insured.    As discussed, <u>supra</u>, the underlying complaints required a defense and, accordingly, indemnification.  Liberty Mutual, at most, raises fact questions for trial.

V.    <u>THE DEFENSES WERE ALL WAIVED</u>

As Black & Decker discussed in Vol. 1 at I, in the Nov. 1998 Mem. at 36-37, in the Dec. 1998 Mem. at 15-16, and in the Notice Brief at 1, notice, including the one-year reporting provision, and the owned property exclusion were waived.  The Court has indicated that it will consider all arguments on the merits rather than permitting Black & Decker to rely upon waiver (Tr. 17).  However, Black & Decker believes its waiver argument is particularly strong as it pertains to the Farrel and SHW claims.  It presents this brief argument as a request to the Court to reconsider and also to demonstrate that its waiver argument has not been abandoned.  Even if, as a matter of trial administration, the owned property exclusion, notice, and the one-year reporting requirement are considered on the merits, waiver is an alternative basis upon which to reject them.

Under Connecticut law, a notice provision is waived when not raised in a denial letter.  <u>Danulevich</u> v. <u>Hartford</u> <u>Fire</u> <u>Ins</u>. <u>Co</u>., 421 A.2d 559 (Conn. Super. App. 1980).  Liberty Mutual concedes that the one-year reporting requirement is a notice provision.

Whether there is a waiver in pleadings or pretrial memoranda is a matter of federal law.  Fed. R. Civ. P. 8(c) requires a defendant to affirmatively plead any matter "constituting an avoidance or affirmative defense."  Examples of such defenses under state law include "breach of insurance policy provisions" and "the claim by an insurer that the loss suffered by the insured was excepted by the policy's terms."  Wright &

Miller, 5 Federal Practice & Procedure, § 1271.  Notice is a policy provision which may be breached by an insured and the owned property exclusion is "excepted matter."[11] "[D]isfavored defenses" generally must be specially pleaded.  Id. The one-year reporting requirement, being a forfeiture clause, is such a disfavored defense.  See Nov. 1998 Mem. at 70-71 and Dec. 1998 Mem. at 14-15.

A three year delay between filing of the suit and first assertion of an exclusion in summary judgment motions made out a waiver of an exclusion in Carey Canada, Inc. v. California Union Ins. Co, 748 F.Supp. 8, 14 (D.D.C. 1990).  Failure to rely upon an exclusion in either the answer or pretrial order was a waiver in Enron Corp. v. Lawyers Title Ins. Corp., 999 F.2d 360, 361 (8th Cir. 1993).  In Torres v. Kmart Corp., 233 F.Supp. 2d 273, 284 (D.P.R. 2002), the district court, relying upon First Circuit precedent, held that a pre-existing condition defense was waived, relying upon the First Circuit's statement that "[[g]enerally speaking, a party must set forth all affirmative defenses in the pleadings, on pain of possible forfeiture … "  Liberty Mutual did not raise notice, including the one-year reporting provision, or the owned property exclusion in its denial letter, in its answer, or in the September 1996 Submission.  See Vol. 1 at I and Notice Brief at 1.  There is a substantial basis to conclude that these defenses have been waived.  In the alternative, waiver of notice provisions, including the one-year reporting requirement, via the denial letter raises a question of fact under Connecticut law which

---

[11]   Federal courts generally look to state practice to determine whether matter is "an avoidance or an affirmative defense."  Wright & Miller, supra.  In Connecticut, both exclusions and notice provisions fit within these categories.  See Frontis v. Milwaukee Insurance Co., 242 A.2d 749, 753 (Conn. 1968)(exclusion); Young v. American Fidelity Insurance Co., 479 A.2d 244, 246-47 (Conn. App. 1984)(condition and exclusion in definitions section); Alderman v. Hanover Insurance Group, 236 A.2d 462, 464 (Conn. 1967)(exclusion).

cannot be resolved on summary judgment. See <u>Loda</u> v. <u>H.K.</u> <u>Sargeant</u> <u>&</u> <u>Associates</u>, 448 A.2d 812, 816 (Conn. 1983)("[w]aiver is a question of fact for the trier").

VI.     <u>CONCLUSION</u>

For the foregoing reasons, for the reasons set forth in Black & Decker's prior briefing, and for the reasons discussed during hearings, Black & Decker's motion for partial summary judgment should be granted and Liberty Mutual's motion for summary judgment should be denied.

By their attorneys,


/s/Jack R. Pirozzolo              .
Jack R. Pirozzolo, BBO# 400400
Richard L. Binder, BBO# 043240
Judith S. Ziss, BBO# 544937
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470