# EXHIBIT D

## Page 1

```
                              Volume: I
                              Pages: 1-202
                              Exhibits: 1-9

            UNITED STATES DISTRICT COURT

              DISTRICT OF MASSACHUSETTS


LIBERTY MUTUAL INSURANCE
COMPANY,
         Plaintiff
                              Docket No.
     vs.                      CA 96-10804-DPW

THE BLACK & DECKER CORPORATION,
BLACK & DECKER INC., BLACK &
DECKER (U.S.) INC., EMHART
CORPORATION AND EMHART
INDUSTRIES, INC.,
         Defendants
```

         DEPOSITION of GREGORY D. MARTIN, a witness called by and on behalf of the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Heidi B. Stutz, Certified Shorthand Reporter No. 146599S and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Willcox, Pirozzolo & McCarthy, 50 Federal Street, Boston, Massachusetts, on Monday, October 27, 2003, commencing at 10:15 a.m.

## Page 2

APPEARANCES:

CHRISTOPHER J. TROMBETTA, ESQ.
Holland & Knight, LLP
10 St. James Avenue
Boston, Massachusetts 02116
    on behalf of the Plaintiff

RICHARD L. BINDER, ESQ.
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
    on behalf of the Defendants

## Page 3

                    I N D E X

WITNESS:          DIRECT  CROSS  REDIRECT  RECROSS

GREGORY D. MARTIN    4

EXHIBITS:         DESCRIPTION                    PAGE

  1    Professional Profile of Gregory D.
       Martin                                      5

  2    List of Articles & Publications
       Authored by Gregory D. Martin              43

  3    Supplemental Expert Report
       On Farrel Corp., Derby, CT
       dated 2/27/03                              70

  4    Supplemental Expert Report of
       Farrel Corp.'s Ansonia Facility
       dated 4/2/03                               84

  5    Rebuttal Expert Report of
       Farrel Corp.'s Derby Facility
       dated 4/2/03                              161

  6    Expert Report of United Shoe
       Mfg. Corp.'s Beverly facility
       dated 2/27/03                             161

  7    Expert Report of Elliot I.
       Steinberg dated 3/6/03                    183

  8    Supplement to Expert Report of
       Jeffrey J. Loureiro dated
       3/4/03                                    183

  9    Supplemental Expert Report of
       Michael P. Bonchonsky dated
       3/4/03                                    183

## Page 4

                    P R O C E E D I N G S

    MR. BINDER:  Mr. Trombetta, can we agree that all objections except objections as to form or motions to strike will be reserved until the time of trial, and if you like, we can waive the requirement for notarization, but the witness will have the opportunity to read and sign?

    MR. TROMBETTA:  That's fine, that's fine.  One other thing, too -- you don't have to put this on the record.

        (Discussion off the record.)

Whereupon:

        GREGORY MARTIN,

having been first duly sworn, was examined and testified as follows:

            DIRECT EXAMINATION

BY MR. BINDER:

    Q.  Mr. Martin, could you please state your name and address?

    A.  Gregory D. Martin.  My home address is 1 Shrewsbury Yard, S-H-R-E-W-S-B-U-R-Y, Yard, Riverton, New Jersey.  And my work address is 1222 Forest Parkway, Suite 190, West Deptford, D-E-P-T-F-O-R-D, New Jersey.

Page 109

1  A. Did I look at what?
2  Q. What you've just listed.
3  A. Yes, and I concluded that certain remedial
4  measures may reduce the potential for future
5  groundwater impact.
6  Q. When you said "may" you had no sense
7  whether it was more likely than not that it would?
8      MR. TROMBETTA: Again, I'll object,
9  but you can answer.
10  A. My response is it would depend. You would
11  need to look at the specifics on the site to make
12  that determination.
13  Q. Well, did you look at the specifics on the
14  site to make that determination?
15  A. And I concluded that it may reduce the
16  potential for future groundwater impact, but it
17  might not. It might not do anything.
18  Q. You didn't bother seeing whether or not it
19  was more likely than not to have that impact?
20  A. I actually looked at what the groundwater
21  impact was before any remedial measures were
22  implemented and found that it didn't warrant any
23  remediation, period.
24      MR. BINDER: Move to strike.

Page 110

1      Now, could you read back the
2  question so I get an answer to the question I asked?
3      (The previous question was read
4      back by the reporter.)
5  A. And my response is I did look at it and I
6  concluded that it may reduce the potential for
7  future groundwater impact.
8  Q. This series of questions, in answer to
9  this series of questions you were addressing the
10  soil vapor extraction. Did you similarly conclude
11  that the capping of impacted soils may reduce the
12  potential for future groundwater impact?
13  A. Yeah, I would agree that in general
14  capping, depending upon a number of factors, may
15  reduce the potential for future groundwater impact.
16  Q. How does capping reduce the potential for
17  future groundwater impact?
18  A. Once again, depending upon a number of
19  factors, by preventing percolation of water through
20  soil capping may prevent or reduce the potential for
21  future groundwater impact.
22  Q. Now, did you form an opinion as to whether
23  or not the soil vapor extraction and the capping
24  were intended to reduce the potential for future

Page 111

1  groundwater impact?
2  A. My impression is that the soil vapor
3  extraction and the capping were intended to meet
4  remedial goals and at the same time facilitate
5  redevelopment of the property.
6  Q. When you say "meet remedial goals" what
7  remedial goals were you referring to?
8  A. They had obligations to meet remedial
9  standards at the site.
10  Q. Are you referring to remedial standards
11  set forth in the RSRs?
12  A. Generally, yes.
13  Q. Are you referring to standards regarding
14  the presence of contaminants in groundwater?
15  A. Can you take the last part and ask the
16  question again, please?
17  Q. Sorry, I don't understand what you mean.
18  I'm going to ask the reporter to read the question
19  again.
20  A. That's fine.
21      (The previous question was read
22      back by the reporter.)
23  A. And that's why I asked you --
24  Q. You're asking about the question that

Page 112

1  preceded that?
2  A. Yes. That's why I don't understand what
3  the context of that question is with respect to what
4  came before it.
5      MR. BINDER: Why don't we --
6      THE WITNESS: You can read both.
7      MR. BINDER -- read them both back.
8      THE WITNESS: That's fine.
9      (The previous questions were read
10      back by the reporter.)
11  A. I'm generally, within the context of that
12  response, referring to contaminants in soil.
13  Q. Contaminants in soil exclusively?
14  A. Based on my review of LEA reports, I would
15  say the requirements are primarily for soils.
16  Q. While they were primarily for soil, do
17  they also include requirements for groundwater?
18  A. When you say "they," what do you mean?
19  Q. The standards that you were referring to.
20  A. As we've talked about, there are reported
21  exceedences of the volatilization criteria for
22  groundwater.
23  Q. Now, the soil that was the subject of the
24  soil vapor extraction and the capping, would

Page 113

1 contaminants from those soils flow into the
2 groundwater at the Derby site?
3     MR. TROMBETTA: I'm sorry, just for
4 my benefit, do you mind reading that back?
5     (The previous question was read
6     back by the reporter.)
7   A. Do you mean at levels which warrant
8 remediation?
9   Q. I mean at any levels.
10   A. Do you mean is it possible that
11 constituent in the soils at the Derby site could
12 migrate to groundwater?
13   Q. Yes.
14   A. We've got groundwater contamination, so I
15 would say yes, that can occur.
16   Q. Would it be fair to say that that had
17 occurred?
18   A. It would be fair that there are
19 contaminants in groundwater at the Derby site.
20   Q. Would it be fair to say that those
21 contaminants in groundwater at the Derby site had
22 originated in soil at the Derby site?
23   A. Without going back to the documents, I
24 would say generally the discharges were onto the

Page 114

1 soil or below the soil, but many, many years -- or
2 years back. But generally I think it's fair to say
3 that, yes, it did migrate through the soil.
4   Q. Through the soil to the groundwater?
5   A. And some levels of constituents reached
6 groundwater, yes.
7     MR. TROMBETTA: Do you mind if we
8 just take a two-minute break?
9     MR. BINDER: Sure. I guess I should
10 say no, I don't mind.
11     (Recess.)
12   Q. Mr. Martin, do you consider groundwater
13 monitoring to be active remediation for groundwater?
14   A. Depends what its purpose is.
15   Q. You're aware that there was groundwater
16 monitoring in connection with the Derby site, are
17 you not?
18   A. You mean as part of the investigative
19 studies?
20   Q. I think there was both investigative
21 studies and planned future groundwater monitoring,
22 isn't that correct?
23   A. I believe there is what's known as O&M
24 monitoring required post-remediation at Derby is my

Page 115

1 understanding.
2   Q. And just for the record, what do you mean
3 by O&M?
4   A. Operation and maintenance.
5   Q. And is that O&M groundwater monitoring
6 intended to -- I'm sorry.
7     What is the purpose of the O&M
8 monitoring?
9   A. Generally the purpose is to demonstrate
10 that a remediation has been successful.
11   Q. Isn't it actually to determine whether or
12 not the remediation of groundwater has been
13 successful?
14     MR. TROMBETTA: Well, I object to
15 that.
16   A. Sounds awfully close, but I would agree
17 that its purpose, that it could serve that purpose.
18   Q. And does groundwater monitoring address
19 any type of contamination other than groundwater
20 contamination?
21   A. Groundwater monitoring monitors
22 groundwater contamination.
23   Q. And depending upon the results of the
24 groundwater monitoring, there's a possibility that

Page 116

1 groundwater remediation could be required in the
2 future, is that correct?
3   A. Are you just talking in general about
4 groundwater O&M?
5   Q. Yeah.
6   A. Just generally speaking, if the O&M
7 monitoring activities were to produce results which
8 resulted in a determination that further remediation
9 was required, then further remediation would be
10 required or could be required.
11   Q. Isn't it the case in connection with the
12 Derby site that depending upon the results of the
13 O&M monitoring, there's a possibility that
14 remediation of groundwater could be required in the
15 future?
16     MR. TROMBETTA: I'd object, but you
17 can answer.
18   A. My assessment of the documents, based on
19 my assessment of the documents, I don't agree that
20 that's the case.
21   Q. Well, if the O&M resulted in finding
22 contaminants in groundwater above applicable
23 standards, isn't there a risk that groundwater
24 remediation could be required?

Page 125

1 to groundwater?
2    A. What portion of that area are you talking
3 about?
4    Q. Any portion of that area.
5    A. I'm talking about soils that are found
6 generally beneath that capped area.
7    Q. When you say "that capped area" what
8 capped area are you referring to?
9    A. I believe there's only one capped area, if
10 you'd like to get a figure, but otherwise it's one
11 capped area at the Derby site.
12    Q. Okay. That's the capped area that you're
13 referring to in your discussion of opinion 7 where
14 you say, among other things, "Remedial measures
15 taken in this area may reduce the potential for
16 groundwater impact, includes soil vapor extraction
17 and capping of impacted soils"?
18    A. It's the same capping. There's one area
19 that's been capped.
20    Q. That is the area you were referring to in
21 opinion 7?
22    A. That was included in that concept, yes.
23    Q. Now, are you familiar with the Connecticut
24 RSRs?

Page 126

1    A. Yes.
2    Q. And to your understanding -- withdrawn.
3      In opinion 8 you also refer to the
4 fact that certain of the environmental response
5 costs are associated with activities intended to
6 prevent future contamination. What activities are
7 you referring to in that sentence?
8    A. Well, in that specific sentence I'm
9 talking about the SVE and the capping activities as
10 we've discussed may reduce the potential for future
11 groundwater impact.
12    Q. Were you referring to anything in addition
13 to those two measures?
14    A. Sitting here today, I don't recall any
15 additional measures.
16    Q. Now, since the time that you prepared your
17 supplemental report have you reviewed additional
18 reports that were prepared by LEA?
19    A. I recall that we received some additional
20 reports from LEA about a month ago.
21    Q. Have you reviewed those reports?
22    A. I've looked at them.
23    Q. From your looking at those reports have
24 you changed any of the opinions that are contained

Page 127

1 in Exhibit 3 or 4?
2    A. I don't believe that I have, although I
3 would point out that I do need to spend more time
4 looking at those documents. They're very thick and
5 they've come in just recently.
6    Q. If you, upon your -- can we say that you
7 reviewed them as of now or would that be too strong
8 a word?
9    A. It's probably too strong a word.
10      I will point out they're over a year
11 old. I would have liked to have had them earlier
12 than a month go.
13    Q. Putting aside -- from your having looked
14 at those reports with whatever level of detail you
15 have spent, do you believe it's likely that your
16 opinions are going to change?
17      MR. TROMBETTA: I'll object, but you
18 can answer.
19    A. Without having looked at them in detail,
20 it's difficult to give you an answer to -- to
21 answer.
22    Q. After you review those reports, are you
23 willing to communicate to us through counsel whether
24 any of your opinions have changed?

Page 128

1    A. To the extent that's an appropriate thing
2 to do, I'd be happy to.
3    Q. Now, are you familiar with the soil clean
4 up standards in the RSRs?
5    A. Yes.
6    Q. Are those standards designed to be
7 protective of groundwater quality?
8    A. There is a component to the RSRs that is
9 intended to be protective of groundwater quality,
10 yes.
11    Q. There's also a component that's designed
12 to be protective of human health, is that correct?
13    A. Direct contact exposure, yes.
14    Q. And typically are the RSR standards for
15 protection of groundwater quality higher or lower
16 than the criteria for protection against direct
17 human contact, direct human exposure?
18    A. Well, it depends what standards you're
19 talking about.
20    Q. How about the -- withdrawn.
21      As to any standards is it correct
22 that the RSR soil criteria for the protection of
23 groundwater are lower than the criteria for
24 protection against direct human exposure?

### Page 141

1 proposed remedial actions and that there were
2 significant remedial activities to be occurring
3 across the entire site this past summer. That's my
4 understanding.
5      MR. TROMBETTA: Mind if we just take
6 a short break?
7      MR. BINDER: Sure.
8      (Recess.)
9 Q. Do you have Exhibit 4 in front of you?
10 A. Yes, I do.
11 Q. And is section 2 of Exhibit 4 a section
12 that you prepared at the request of counsel after
13 you had submitted your draft report?
14 A. I see section 2.
15      MR. BINDER: Would you read the
16 pending question to him, please?
17      (The previous question was read
18      back by the reporter.)
19 A. Yes, pursuant to our earlier discussion,
20 this was the descriptive section that we talked
21 about.
22 Q. Now, at the Ansonia site did you find --
23 withdrawn.
24      With respect to the Ansonia site

### Page 142

1 were there any areas in which there was
2 contamination in groundwater above any criteria of
3 the RSRs?
4      MR. TROMBETTA: I'm sorry, did he
5 say "in groundwater"?
6      MR. BINDER: Yes.
7 A. You mean, if you mean any criteria
8 including tabulated criteria, my understanding is
9 that there are some exceedences.
10 Q. Can you identify the locations of those
11 exceedence?
12 A. I don't think I can locate all of them,
13 but I can generally describe some of them.
14 Q. Could you generally describe as many of
15 them as you can?
16 A. My understanding is that there are some
17 exceedences of tabulated criteria for VOCs in the
18 vicinity of what's known as the carpenter area. I
19 also understand there are some exceedences of metals
20 in groundwater which are more site-wide and have
21 been attributed to upgradient operations.
22 Q. Now, who attributed those metals
23 exceedence to off-site operations?
24 A. It's my recollection that those are

### Page 143

1 conclusions that were drawn in LEA reports. And
2 although it's been a while since I've looked at the
3 actual data, it's my recollection that I concurred
4 with them, as well, concurred with LEA's
5 conclusions.
6 Q. Is section 2 essentially a section you
7 prepared to summarize pertinent information from the
8 reports of LEA and the reports of the consultants
9 who worked in connection with the SHW site?
10 A. Similar to my response when you asked the
11 question regarding Derby, I did not do any
12 independent fieldwork, etc., but rather this section
13 generally summarizes what was contained in pertinent
14 reports.
15 Q. On page 4 of the report you mention that
16 there was groundwater contamination in a foundry and
17 roll shop at the SHW portion of the Ansonia site.
18 A. Uh-huh, I see that.
19 Q. Do you know what the cause of that
20 groundwater contamination was?
21 A. My recollection sitting here today is that
22 it was related to petroleum hydrocarbons, but I
23 would have to go back to the documents to refresh my
24 memory on that.

### Page 144

1 Q. And do you know what the cause was of the
2 petroleum hydrocarbons in the groundwater?
3 A. Sitting here today, I don't recall whether
4 it was related to underground storage tanks or some
5 other uses of petroleum hydrocarbons, so I would
6 need to refresh my memory on that subject.
7 Q. Do you know what was done to remediate
8 that groundwater contamination?
9 A. Sitting here today, I do not.
10 Q. Do you have an understanding as to whether
11 that contamination was remediated?
12 A. I don't know one way or another sitting
13 here today.
14 Q. Did you prepare for your deposition?
15      MR. TROMBETTA: Objection.
16 A. Yes, I did.
17 Q. What did you do to prepare for your
18 deposition?
19 A. I reviewed numerous documents over a great
20 deal of time. However, I've got many, many file
21 cabinets full of documents that I've reviewed over
22 the course of this case.
23 Q. Other than reviewing documents, did you do
24 anything to prepare for your deposition?

Page 149

1 and they're huge documents. But I will plan to do
2 that, as well.
3      MR. TROMBETTA: I thought we had
4 tried to obtain documents, but --
5      MR. BINDER: Just in case there's
6 issue about a specific document that you think might
7 exist that's pertinent you haven't received, just
8 let us know and we'll look into it. I'm just making
9 that offer to you.
10      MR. TROMBETTA: Okay. People
11 preparing the reports should provide them to us, in
12 any event, but that's just something for the record.
13      MR. BINDER: It's an ongoing
14 project, so as things go along that you think you
15 need, we'll be happy to address it.
16      MR. TROMBETTA: I guess what I'm
17 saying is as things are prepared, they should be
18 provided to us in any event, whether we ask or not.
19 So we can continue.
20   Q. Now, on the bottom of page 7, the last
21 bullet point refers to activities at Ansonia that
22 may reduce the potential for future groundwater
23 impact. Do you see that?
24   A. I see the last bullet on page 7, yes.

Page 150

1   Q. In that bullet you provide a list of
2 activities that may reduce the potential for future
3 groundwater impact, is that correct?
4   A. I see some things listed, yes.
5   Q. And how will the excavation of soils
6 contribute to the reduction of the potential for
7 future groundwater impact?
8   A. It's the same concept that we've talked
9 about previously, and that is if you take a mass of
10 soil that has some constituents that might migrate
11 to groundwater and remove that entire mass of
12 contamination, well, then it's no longer available
13 to migrate and that may reduce the potential for
14 future groundwater impact.
15   Q. When you say "groundwater impact," what do
16 you mean?
17   A. Constituents in groundwater.
18   Q. Is that constituents in groundwater at any
19 particular level or any at all?
20   A. Just constituents in groundwater.
21   Q. At any level?
22   A. May reduce the potential for future
23 groundwater impact. Impact is constituents in
24 groundwater.

Page 151

1   Q. There's no minimum level of constituents
2 to meet your definition of "groundwater impact"?
3   A. In the context of this sentence, no. I
4 can't say that there's not somewhere else where I
5 may have used it somewhat differently, but not by
6 design. In the context of this sentence, it's
7 constituents reaching groundwater. And there is a
8 totally separate issue with respect to is it
9 actionable.
10   Q. How will the establishment of
11 environmental land use restrictions reduce the
12 potential for future groundwater impact?
13   A. A similar concept in that to the extent
14 there's some contaminated soil material beneath a
15 building and land use restrictions which restrict
16 the demolition of certain buildings could prevent a
17 molecule or a constituent from migrating from that
18 soil mass and reaching groundwater.
19   Q. Have you determined whether the future
20 ELURs will have a significant impact on future
21 groundwater? Let me withdraw that question.
22      Have you determined how significant
23 the impact on groundwater would be in the absence of
24 the ELURs?

Page 152

1   A. You mean if there were no environmental
2 land use restriction that restricted the demolition
3 of certain buildings and therefore those buildings
4 were demolished, is that what you're asking, have I
5 then determined what effect that would have on
6 potential future groundwater contamination?
7   Q. Yeah.
8   A. Not other than to the extent it doesn't
9 exist today, there's a potential that it might occur
10 if the buildings were removed.
11   Q. You refer in the next to last line in this
12 bullet point to --
13   A. I missed you, next to last what?
14   Q. Bullet point, I'm sorry, the next to last
15 line on the last bullet you refer to areas of
16 impacted soil. What do you mean by impacted soil?
17   A. Contaminated soil.
18   Q. Similarly, in the first bullet point on
19 page 8, is that a listing of the, certain remedial
20 activities at the Ansonia site that are likely to
21 reduce the potential for future groundwater impact?
22   A. I said that they may reduce.
23   Q. Are they likely to?
24      MR. TROMBETTA: Well, I'll object.

Page 157

1  A. Without reading every last bullet, my
2  sense is -- and without sitting here trying to
3  rethink the bases for that opinion, which is a
4  comprehensive exercise, you know, I'm not aware of
5  any particular issues above and beyond what's in
6  there. I mean, there certainly have been some
7  modified conditions identified as a result of, for
8  example, Loureiro's deposition, and my understanding
9  is that there's been remediation during the course
10 of this summer that I would be interested in better
11 understanding what occurred. But I don't have the
12 facts on that at this juncture.
13    Q. Now looking at opinion 8, are you aware of
14 any bases for that opinion other than the bases
15 stated in the bullet points beneath that opinion?
16    A. I would give the same answer as I did on
17 7. I haven't intentionally withheld any information
18 that I believed pertinent, nor can I say that it's
19 absolutely all-inclusive.
20    Q. I'm sorry, have you finished your answer?
21    A. Yeah, I have finished.
22    Q. Now, does the groundwater beneath the
23 Ansonia plant flow to any other body of water?
24    A. Generally speaking, yes.

Page 158

1     Q. What body of water?
2     A. Generally speaking, I would say the
3  Naugatuck River.
4     Q. Similarly, does the groundwater below the
5  Derby site flow to any body of water?
6     A. Yes.
7     Q. What body of water?
8     A. It may flow to the Naugatuck River or the
9  Housatonic River or toward the confluence of the
10 two.
11    Q. Have you ever been at the Ansonia site?
12    A. Yes.
13    Q. When?
14    A. I don't recall off the top of my head.
15    Q. Was it before or after you prepared your
16 supplemental report?
17    A. I think it was before, but I can't be
18 sure. I would have to check the dates.
19    Q. Do you have records that would tell you
20 the dates?
21    A. I'm quite sure something like that I would
22 be able to find a record.
23    Q. Did you coordinate that visit to the site
24 with counsel?

Page 159

1     A. Yes.
2     Q. Were you given permission to go on that
3  site?
4     A. I was escorted by on-site personnel and I
5  believe there was counsel from this office here
6  there. I could be mistaken. Which site, we are
7  talking about Ansonia?
8     Q. Yes. Were you ever present at the Derby
9  site?
10    A. Yes.
11    Q. When?
12    A. Same visit.
13    Q. Were you ever present at the Beverly,
14 Massachusetts site as to which you prepared a
15 report?
16    A. Yes.
17    Q. When was that?
18    A. About two weeks ago.
19    Q. Were you accompanied by anybody at that
20 time?
21    A. No. I did that on my own.
22    Q. Did you obtain permission from any of the
23 owners of the site to be there?
24    A. It's a public property with McDonald's, a

Page 160

1  Stop & Shop and a public entity, so no, I just
2  walked around, drove in public areas.
3     Q. Did you go to any areas of that site other
4  than public areas?
5     A. Certainly not on purpose and not to my
6  knowledge.
7        MR. TROMBETTA: Just for the record,
8  my understanding was there was problems getting
9  permission from the owner of that site with respect
10 to any site visits of other nonpublic areas, I
11 believe. I think we learned that through your
12 office.
13    Q. Now, under opinion 8 you state, as you did
14 with Derby, that certain of the proposed
15 environmental response costs are associated with
16 activities to prevent future contamination. Have
17 you listed in bold points below opinion 8 each of
18 those proposed environmental response costs that you
19 believe are associated with activities intended to
20 prevent future contamination?
21    A. I think we've discussed them. For
22 example, environmental land use restrictions that
23 restrict the demolition of certain buildings,
24 capping activities would fall into the same