UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LIBERTY MUTUAL INSURANCE CO., )
                              )
        Plaintiff,            )
                              )
        v.                    )
                              )
THE BLACK & DECKER CORP.,     )          CIVIL ACTIONS
BLACK & DECKER, INC.,         )          No. 96-10804-DPW
BLACK & DECKER, U.S. INC.,    )          No. 04-10651-DPW
EMHART CORP., and EMHART      )
INDUSTRIES, INC.,             )
                              )
        Defendants.           )

MEMORANDUM AND ORDER
REGARDING SUMMARY JUDGMENT
FOR THE ANSONIA AND DERBY SITES
August 5, 2004

The common theme in this sprawling litigation is whether
Liberty Mutual is obligated to compensate Black & Decker, under
Liberty Mutual insurance policies issued to Black & Decker and
its corporate predecessors, for various expenses arising from the
cleanup of environmentally contaminated land.  In this
Memorandum, I address the availability of summary judgment
regarding issues surrounding industrial sites at Ansonia,
Connecticut and Derby, Connecticut.

A.  Facts . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    1.  <u>Corporate history</u> . . . . . . . . . . . . . . . -3-
    2.  <u>Site histories</u> . . . . . . . . . . . . . . . . . -3-
        (a)  <u>New Farrel Ansonia site</u> . . . . . . . . . -3-
        (b)  <u>SHW Ansonia site</u> . . . . . . . . . . . . -4-
        (c)  <u>Derby site</u> . . . . . . . . . . . . . . . -5-

B.  Relevant Policies . . . . . . . . . . . . . . . . . . -6-

C.  Procedural History . . . . . . . . . . . . . . . . . -7-
    1.  <u>SHW Action</u> . . . . . . . . . . . . . . . . . -7-
    2.  <u>New Farrel Actions</u> . . . . . . . . . . . . . . -7-
    3.  <u>Notice to Liberty Mutual</u> . . . . . . . . . . -8-

D.  Analysis . . . . . . . . . . . . . . . . . . . . . . -10-
    1.  <u>One-Year Reporting Provision</u> . . . . . . . . . -10-
        (a)  <u>Foreign vs. domestic application</u> . . . . . -11-
        (b)  <u>Public policy</u> . . . . . . . . . . . . . . -12-
    2.  <u>Accident/occurrence/damages</u> . . . . . . . . . -23-
        (a)  <u>Legal standard</u> . . . . . . . . . . . . . -24-
        (b)  <u>SHW Action</u> . . . . . . . . . . . . . . . -27-
        (c)  <u>New Farrel Actions</u> . . . . . . . . . . . -31-
    3.  <u>Pollution exclusion</u> . . . . . . . . . . . . . -32-
    4.  <u>Owned property exclusion</u> . . . . . . . . . . . -33-
        (a)  <u>Legal standard</u> . . . . . . . . . . . . . -33-
        (b)  <u>Application</u> . . . . . . . . . . . . . . . -36-
    5.  <u>Late notice</u> . . . . . . . . . . . . . . . . . -39-
        (a)  <u>Timeliness</u> . . . . . . . . . . . . . . . -39-
        (b)  <u>Prejudice</u> . . . . . . . . . . . . . . . . -41-
            (i)  <u>Merit-based arguments</u> . . . . . . . . -42-
            (ii) <u>History-based arguments</u> . . . . . . . -43-
    6.  <u>Duty to indemnify</u> . . . . . . . . . . . . . . -47-

E.  Conclusion . . . . . . . . . . . . . . . . . . . . . -49-

**A.    Facts**

1.    Corporate history

Before 1967 the Ansonia and Derby sites were owned and operated by Farrel Company.  In 1968 USM acquired Farrel, and operated it (including the Ansonia and Derby sites) as a division of USM until 1986.  In 1986 USM sold the Derby site and part of the Ansonia site to an independent and unaffiliated entity called Farrel Corporation ("New Farrel"), and sold the rest of the Ansonia site to SHW.  New Farrel and SHW apparently continue to use the sites for industrial purposes.

2.    Site histories

(a)    New Farrel Ansonia site

The Ansonia site is located just east of the Naugatuck River in Ansonia, Connecticut.  Its principal operations have included refurbishing machinery for working rubber and plastic goods. Wastes deposited on the site included degreasing solvents, waste sludge, coolants, and oils.  Solvents reached the soil in various ways, including spillage when employees removed solvents from drums without a funnel or washed their hands in solvent, and regular monthly disposal of used solvent or waste sludge in a scrap yard and various other outdoor areas.

A significant portion of the waste was used solvent from nitriding operations.  This solvent -- from 1943-80, mainly tetrachloroethylene (more commonly known as perchloroethylene or "PCE") -- was used to degrease components before placing them in a nitriding furnace for hardening.  Much of it was dumped in the

immediate vicinity of the nitriding building.  In addition,
various solvents, including trichloroethylene ("TCE"), were used
to clean machinery in the yard, and the residue ran into the
ground.  Divers other solvents were dumped at various locations
at the plant site.  On some occasions, solutions were dumped
directly into the Naugatuck River.

Principal contaminants found at the site include PCE, TCE,
1,1,1-trichlorethane ("TCA"), and other halogenated solvents.

(b)  <u>SHW Ansonia site</u>

SHW's portion of the Ansonia site consists of the foundry
operation and roll shop.  The contamination derives from disposal
of various fluids into a "tail race" (underground channel) that
drained to the Naugatuck River, and from PCB-laden oil leaking
from electrical capacitors in the foundry and a gun drill machine
in the roll shop.

Electrical capacitors were installed in the foundry during
the mid-1960s in connection with electrical induction furnaces.
Shortly after installation, the capacitors began to swell and
regularly leak PCB-laden oils onto the floor.  Farrel would
generally wait until a substantial number of the capacitors were
leaking before fixing them, because that repair involved shutting
down the furnaces.  These PCB-laden oils drained into the tail
race through an access manhole.  Transformers also leaked PCB-
laden oil in a similar manner.

Another source of contamination was a leaky gun drill
machine in the roll shop.  From approximately 1964-79, the gun

-4-

drill machine regularly leaked oil onto the floor, despite
Farrel's attempt to control the leaks with a plug.

Finally, during the 1960s, Farrel pumped water-soluble
solvents and coolants into a drain leading into the tail race,
from which they would flow into the Naugatuck River.

Principal site contaminants include PCB and various
solutions that were discharged into the tail race. The PCB
contamination in the foundry was directly attributed to the
leaking capacitors and transformers, and was also a significant
source of contamination of the tail race.

(c)   Derby site

The principal operations at the Derby, Connecticut site also
included manufacturing and refurbishing machinery for working
rubber and plastic goods. Wastes deposited on the site include
oils, solvents (including TCE, PCE, TCA, and kerosene), grinding
coolant, metal shavings, scrap iron, discarded engines, and
various waste residues.

Much of the contamination derived from the process of
cleaning machines, known as "Banbury mixers," that were sent to
the plant for reconditioning. The cleaning process involved
outdoor burning (using solvents as ignition agents) to remove
residues, and then degreasing the parts in the machine shop with
a liberal application of solvent.

Parts of disassembled mixers were cleaned in a vapor
degreaser that was filled with PCE. Machine parts were lowered
into the degreaser, then removed and set on the floor nearby.

Solvent spilled during this process would drain onto the floor --
which was originally wooden blocks set over a dirt floor, but was
replaced by cement no later than 1970 -- and sometimes through a
drain that led outside the building.

Waste metal chips that contained oil and used solvent
residues were stored outdoors in fifty-five gallon drums with no
protection from the rain.  When rain caused the drums to
overflow, or when employees forgot properly to fasten "bungs"
meant to seal the drums from leakage out the sides, the contents
spilled onto the ground.  Finally, in many cases workers would
simply dump the contents of the drums into a drain in the chip
shed.

Principal site contaminants include PCE, other solvents, and
oils.

**B.   Relevant Policies**

Farrel was insured by Liberty Mutual CGL policies in its own
name from approximately 1927 to November 1, 1971, and under USM
policies from 1971-79.  Given my resolution of Liberty Mutual's
motion for partial summary judgment as applied to specific policy
periods, the policies at issue for this site are Farrel's
accident-based CGL policies from 1961-67; its occurrence-based
policies from 1967-71; its EL policies from 1964-69; USM's CGL
policies from 1971-79; and USM's EL policies from 1972-79.

C.    **Procedural History**

    1.    <u>SHW Action</u>

    On January 29, 1988 SHW filed a civil action against EII and Emhart in Connecticut state court.  (SHW Complaint, Defs.' App. XXXIV at 86-97.)  SHW alleged that the parcel that it purchased and the groundwater beneath had been contaminated with heavy metals, PCBs, and other pollutants before SHW acquired the site. SHW pled claims of breach of contract, negligent misrepresentation, intentional misrepresentation, fraud, violation of the Connecticut Consumer Unfair Trade Practices Act, violation of the Connecticut Transfer Act, and indemnification. It specifically sought reimbursement of remediation costs under Conn. Gen. Stat. §§ 22a-134 <u>et seq.</u> & 22a-452.

    On October 6, 1994 Black & Decker and SHW settled the SHW action.  Black & Decker agreed to pay SHW $100,000 outright; to reimburse up to $300,000 of SHW's costs for remediating PCB contamination in the roll shop, foundry, and tail race; and to contribute three-quarters of the cost of remediating contamination caused by the leaking gun drill machine, if and when such remediation is ordered by state or federal authorities before 2009.  (Defs.' App. XXXV at 2-10.)

    2.    <u>New Farrel Actions</u>

    On December 7, 1989 New Farrel filed a civil action against USM in Connecticut state court.  (Defs.' App. XXXIV at 28-35.) On September 21, 1990 it filed a related civil action against Emhart, EII and USM in the United States District Court for the

District of Connecticut.  (Id. at 44-57.)  The state court proceeding was later stayed pending the resolution of the federal action.  An amended federal complaint was filed on May 3, 1991. (Id. at 58-83.)

New Farrel's complaints alleged that pollution had resulted from, inter alia, "[d]egreasing and other activities conducted at the Ansonia Plant . . . [, s]crap metal storage, storage of waste in drums . . . [, and] activities at the Derby Plant, including . . . degreasing operations and the cleaning of equipment sent to the Derby Plant to be repaired."  (Id. at 48, 50-51, 64-65.)

On February 17, 1995, with the assistance of a court-appointed mediator on the eve of trial, Black & Decker settled the New Farrel litigation.  Black & Decker agreed to pay New Farrel $1,587,500 and to investigate and remediate contamination at both the Ansonia and Derby sites.  It agreed to perform any remediation required by the Connecticut Department of Environmental Protection, but could seek reimbursement from New Farrel for remediation of contamination that did not predate New Farrel's acquisition of the parcels.  (Id. at 245-46, 361A; Cordiano Aff., Defs.' App. XCVI ¶¶ 5-9, 15-17.)

3.  Notice to Liberty Mutual

On January 10, 1990 Black & Decker sent Liberty Mutual copies of the SHW complaint and the New Farrel first amended state complaint -- but not the New Farrel federal complaint -- and on May 9, 1990 it formally tendered a request for defense and indemnification.  (Defs.' App. XXXIV at 85-106.)  On May 29, 1990

-8-

Liberty Mutual requested further information.  Various correspondence was exchanged between the companies during 1990.

On July 13, 1993 Aetna -- which also provided insurance coverage applicable to the Ansonia and Derby sites, and which Black & Decker had notified about the claims -- forwarded Liberty Mutual a copy of the various state complaints in the New Farrel state case, and the federal complaint.  (Defs.' Supp. Submission Regarding the Newly Raised Issues of Tender and Notice/Prejudice, Ex. A at 34219.)  In its cover letter, Aetna explained that it was forwarding the complaints to Liberty Mutual because they "may be of assistance to you in determining your duty to defend these actions."  (Id.)  While Black & Decker does not appear to have submitted formal notice or tender of the New Farrel federal action until 1995, by July 1993 the Liberty Mutual claim file contained, within a list of invoices for which Black & Decker sought reimbursement, invoices labeled "Farrel Corp. v. Emhart Corp. U.S. District Court," as well as a letter indicating that Liberty Mutual had received the federal complaint.  (Defs.' Reply Mem. Regarding Md. & Conn. Sites, App. at 37-39, 45.)

Various correspondence was exchanged between Black & Decker and Liberty Mutual during 1993 and 1994.  On June 14, 1994 Liberty Mutual denied Black & Decker's claims on the grounds that the pollution exclusion excluded coverage, that the damage was not manifest until after the policies' expiration, and that the complaints did not seek "damages" under the policies.

On December 23, 1994 Black & Decker's attorneys notified
Liberty Mutual of a proposed settlement of the New Farrel federal
and state court actions.  (Defs.' Supp. Submission Regarding the
Newly Raised Issues of Tender and Notice/Prejudice, Ex. A at
34178-79.)  On January 4, 1995 Liberty Mutual responded,
"reassert[ing] in its entirety [its] denial of coverage as set
forth in [its] letter of June 14, 1994."

**D.    Analysis**

1.   <u>One-Year Reporting Provision</u>

Farrel's 1961-67 policies each contain an Amendatory
Endorsement that provides:

> The policy applies only to . . . injury to or
> destruction of property, including loss of use thereof,
> which occur during the policy period anywhere in the
> world, except that if the insured at the time a claim
> is made against it is no longer covered by a liability
> policy issued by the company [i.e., Liberty Mutual],
> this policy shall not apply under Coverage B to injury
> to or destruction of property, including the loss of
> use thereof, which is caused by exposure to conditions
> over a period of days, weeks, months, or longer and
> <u>which is not reported by the insured to the company
> within one year after the policy period.</u>

(<u>E.g.</u>, Farrel 1961 Policy, Amendatory Endorsement ¶ 7, Defs.'
App. III at 29 (emphasis added).)  Black & Decker concedes that
it did not report the damage at the Ansonia and Derby sites to
Liberty Mutual within one year after the end of Farrel's coverage
by Liberty Mutual.[1]  However, Black & Decker raises two
objections to the application of this one-year reporting

---

[1]Indulging inferences favorable to Black & Decker, Farrel's
coverage under Liberty Mutual policies continued through 1979.

-10-

provision: (a) by its terms it only applies to foreign claims; and (b) even if it applies domestically, it is void as against public policy.[2]

(a)  Foreign vs. domestic application

Paragraph 7 of the endorsement, which contains the reporting provision, is captioned "World Wide Coverage, Policy Period Modified."  (Defs.' App. III at 29.)  Black & Decker attempts to infer, from Paragraph 7's proximity to Paragraph 6 ("Defense and Settlement in Foreign Countries") and the fact that Paragraph 7 "amend[s]" the original policy, rather than "substituting" text, that Paragraph 7 only applies to foreign claims.  I find this attempt unpersuasive.

The opening sentence of Paragraph 7 states that the standard CGL jacket's Insuring Agreement IV "is amended to read" as set forth in the amendatory endorsement.  (Defs.' App. III at 29.)  Insuring Agreement IV is itself captioned "Policy Period, Territory," and, before amendment, reads in full: "This policy applies only to accidents which occur during the policy period within the United States of America, its territories or possessions, or Canada." (Id. at 31.)  Paragraph 7, in the very same sentence as the one-year reporting provision, states that the policy applies to injury that "occur[s] during the policy period anywhere in the world." (Id. at 29 (emphasis added).)  To

_____

[2]Black & Decker also argues that the provision is ambiguous because it uses slightly different language from a different paragraph of the endorsement that redefines "accident."  This contention is wholly without merit.

synthesize:  Insuring Agreement IV limits the scope of coverage
to the United States, its territories, and Canada; Paragraph 7
amends Insuring Agreement IV to expand the geographic coverage,
but also limit the temporal coverage.  Black & Decker's position
is that Paragraph 7 only <u>adds</u> coverage to Insuring Agreement IV,
while leaving the original, domestic Insuring Agreement IV
intact.  I find this interpretation strained and unconvincing.
<u>See</u> <u>Textron, Inc. v. Liberty Mut. Ins. Co.</u>, 639 A.2d 1358, 1363
(R.I. 1994) (construing same endorsement, considering same
argument by insured, and reaching same conclusion).

   (b)  <u>Public policy</u>

   More fundamentally, Black & Decker argues that the one-year
reporting provision operates as a forfeiture and violates
Connecticut public policy.  Liberty Mutual argues that this
provision essentially converted the Farrel policies from accident
or occurrence policies to claims-made-and-reported policies.  In
order to understand this point, a brief discussion of the
taxonomy of insurance policies may be helpful.

   In insurance parlance, occurrence policies[3] cover acts or
omissions by the insured that occurred during the policy period,
regardless of when a claim is made against the insured.  By
contrast, a claims-made (or "discovery") policy -- most often
seen in professional liability insurance -- covers any claim made

_____

   [3]The label "occurrence" is meant to distinguish these
policies from claims-made or claims-made-and-reported policies,
not from accident-based policies, and so for this purpose
includes accident-based policies.

-12-

against the insured during the policy period, regardless of when the injury-causing event occurred.  A special variant of the claims-made policy is the claims-made-and-reported policy, which (like the claims-made policy) only covers claims made against the insured during the policy period, but further limits coverage to those claims reported to the insurer during the policy period, or within a specified time thereafter.  See DiLuglio v. New Eng. Ins. Co., 959 F.2d 355, 358 (1st Cir. 1992) (explaining occurrence and claims-made policies); Textron, 639 A.2d at 1362 nn. 1-2 (explaining occurrence, claims-made, and claims-made-and-reported policies).

Liberty Mutual contends that the one-year reporting provision converted the policies into a hybrid of sorts: so long as Farrel maintained coverage with Liberty Mutual, the policies were occurrence policies, but upon Farrel's termination of coverage, they metamorphosed to claims-made-and-reported policies.  By so doing, Liberty Mutual argues, it could essentially eliminate "tail" liability, the insurer's potential exposure, under occurrence policies, to claims made after the policy expires -- such as the claims at issue here.

Black & Decker disagrees and contends that the provision is nothing more than a notice provision.  It scoffs at the idea that Liberty Mutual could "surreptitiously" amend an occurrence policy and thereby convert it to a hybrid occurrence/claims-made-and-reported policy without reducing the premium in exchange, or at least mentioning this shift somewhere, even in an internal

memorandum.[4]

The Supreme Court of Rhode Island, construing this very amendatory endorsement in another Liberty Mutual policy, concluded that the amendment turns the policy into something not quite an occurrence policy and not quite a claims-made-and-reported policy, but rather a "hybrid occurrence polic[y] containing reporting requirements." <u>Textron</u>, 639 A.2d at 1365. Ultimately, I find, it is less important to resolve the taxonomical debate than to determine what the contract language means, and whether it applies.

Black & Decker frames the one-year reporting provision as a notice provision that places a duty on the insured in order to make a claim against its coverage, rather than a substantive limit on the coverage itself. And it is well established that under Connecticut law, "[i]f it can be shown that the insurer suffered no material prejudice from the delay, the nonoccurrence

---

[4]Black & Decker contends that a Liberty Mutual internal memorandum describes the change as "nominal," but that reference does not appear to apply to Paragraph 7 of the Amendatory Endorsement. (<u>See</u> Sanborn Letter, Defs.' App. XV at 21.) Black & Decker also argues that "[c]laims made policies were not even heard of until the 1980's," but that is plainly false. <u>See, e.g.</u>, <u>Brander v. Nabors</u>, 443 F. Supp. 764, 767 (D. Miss. 1978) (describing a 1968 claims made policy and explaining that "[t]he insurance industry has, for some years, provided two basic types of professional liability insurance [one of] which may be classified as [] 'claims made' policies (sometimes called 'discovery' policies)"), <u>aff'd</u>, 579 F.2d 888 (5th Cir. 1978); <u>Lehr v. Prof'l Underwriters</u>, 296 N.W. 843, 844 (Mich. 1941) (construing a claims-made policy); Carolyn M. Frame, <u>"Claims-Made" Liability Insurance: Closing the Gaps with Retroactive Coverage</u>, 60 Temp. L.Q. 165, 171-75 (1987) (describing history of claims-made policies).

of the condition of timely notice may be excused." <u>Aetna Cas. &
Sur. Co. v. Murphy</u>, 538 A.2d 219, 223 (Conn. 1988).

However, <u>notice</u> provisions differ fundamentally from
<u>reporting</u> requirements.  Notice provisions, which are typically
found in occurrence and claims-made policies, usually require
that notice be "reasonable" or "as soon as practicable," and
serve simply to help the insurer to investigate the claim while
events are relatively fresh.  For example, Liberty Mutual's
standard CGL notice provision requires the insured to provide
"the time, place and circumstances of the accident, the names and
addresses of the injured and of available witnesses."
(Conditions ¶ 8, 1961 Farrel CGL Policy, Defs.' App. III at 34.)
Reporting provisions, which are only found in claims-made-and-
reported policies, require reporting within a fixed period of
time, because they actually define the scope of coverage; the
coverage-triggering event is not the occurrence or the claim, but
the reporting of the claim.  <u>See</u> <u>Textron</u>, 639 A.2d at 1364.  They
do not specify the precise information required, because the
purpose is not so much to help the insurer's investigation as to
trigger coverage.

Of course, the labels "notice" and "reporting" have no
talismanic value, and one can get distracted by pointless
taxonomical exercises.  <u>Cf.</u> <u>id.</u> ("When dealing with hybrid
creatures, such as Liberty's policies, we emphasize that our
inquiry into the nature of any provision must necessarily be
guided by the operation and substance of a particular provision

rather than any label that may coincidentally or haphazardly be attached to a policy.").

Perhaps a more productive way to approach the question is to confront the principal difference between "notice" and "reporting" provisions.  While both require the insured to require the insured to inform the insurer of an injury-causing event and/or a claim, they are located in different portions of insurance contracts, and this difference is critical.  I suggest that a provision may be deemed a "notice" provision if it is contained in a separate clause of the insurance contract.  Because it is in a separate clause, it creates an independent duty upon the insured; the remedy for breach of this duty may or may not be forfeiture of insurance coverage, depending on whether the insurer was prejudiced.  By contrast, a provision may be deemed a "reporting" provision if it is contained in a clause that defines the coverage itself.  It is therefore part of the definition of coverage, and substantively limits it.  It does not create a duty that the insured may breach, but rather it defines a condition precedent to coverage, much as most policies require a "claim" and/or a "suit" for coverage.

Under this analysis, it is clear that the provision at issue here falls into the latter category: it is contained within Paragraph 7, which defines the coverage period by amending Insuring Agreement IV, and it is clearly distinct from the standard CGL jacket's "notice" provision.  (See Defs.' App. III at 34.)

But that only begins the inquiry.  The next question is whether Connecticut would enforce a reporting requirement that substantively limits coverage, particularly in the context of the somewhat unusual "hybrid" policy here.  Black & Decker offers three reasons why Connecticut courts would hold such a requirement void as against public policy: (1) it renders the coverage largely worthless for environmental harms because it requires prompt reporting of an unknown loss; (2) because the reporting requirement is only triggered if the company changes insurers, it means that coverage turns on events that occur long after the policy has expired; and (3) it acts to inhibit freedom of contract by discouraging insureds from changing insurers.

The cases are somewhat divided on these points, reflecting the differing public policies of different states.  Various courts have considered policies that essentially require both the injury-causing act or omission and the claim to occur during the policy period, and have reached precisely opposite results.  In Sparks v. St. Paul Insurance Co., 495 A.2d 406, 414 (N.J. 1985), the New Jersey Supreme Court considered such a policy, and held it void as against public policy because it "combines the worst features of 'occurrence' and 'claims made' policies and the best of neither [by providing] neither the prospective coverage typical of an 'occurrence' policy, nor the 'retroactive' coverage typical of a 'claims made' policy."  New Jersey has also held that a claims-made policy is void as against public policy if it provides retroactive coverage on the condition that the insured

carried a policy by the same insurer at the time of the incident.
See Jones v. Cont'l Cas. Co., 303 A.2d 91, 94 (N.J. Super. Ct.
Ch. Div. 1973) (holding that provisions with this effect violate
freedom of contract).

By contrast, in Gereboff v. Home Indemnity Co., 383 A.2d
1024, 1028 (R.I. 1978), the Rhode Island Supreme Court considered
essentially the same question, and found no public policy
problem, explaining that it was "unaware of any principle that
. . . condemns on public policy grounds coverage that combines
elements of both 'discovery' and 'occurrence' policies, but
provides less protection than is customarily afforded by either."
And in Textron, the Rhode Island court considered a challenge to
the enforceability of the same endorsement as presented here, but
found no public policy against it.  See 639 A.2d at 1363.

Other courts have taken an intermediate position.  For
instance, in Brander v. Nabors, 443 F. Supp. 764 (N.D. Miss.
1978), aff'd, 579 F.2d 888 (5th Cir. 1978) (per curiam), the
court considered a claims-made policy that provided no
retroactive coverage, but provided prospective coverage for three
years for malpractice committed during the policy period.  It
found no public policy problem there, but noted in dicta that it
"would be confronted with a more serious question of public
policy if a 'claims made' policy with neither a period of
retroactive coverage nor a period of prospective coverage, but
requiring notice to the insurer within the policy period, were
involved."  Id. at 773; see also James J. Mawn Enter., Inc. v.

-18-

Liquor Liability Joint Underwriting Ass'n, 42 Mass. App. Ct. 417, 418-20 & n.2 (1997) (noting in dicta that there was no public policy flaw in a similar policy); cf. Endicott Johnson Corp. v. Liberty Mut. Ins. Co., 928 F. Supp. 176, 182-83 183 (N.D.N.Y. 1996) (considering apparently identical clause, but holding it inapplicable because, in that suit, damage was not caused by "continuing exposures" as court understood that term), appeal dismissed, 116 F.3d 53 (2d Cir. 1997).

I now turn to the precise question posed here: a policy without retroactive coverage, but with prospective coverage conditioned on continued insurance by the same carrier. Put differently, would Connecticut follow Rhode Island's Gereboff/Textron line, or hew more closely to New Jersey's Jones/Sparks line? Connecticut, like most states, requires a clear public policy in order to void a contract provision, and contracts are presumed not to violate public policy:

> The principle that agreements contrary to public policy are void should be applied with caution and only in cases plainly within the reasons on which that doctrine rests; and it is the general rule . . . that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts. The impropriety injurious to the interests of society which will relieve a party from the obligation he has assumed must be clear and certain before the contract will be found void and unenforceable.

Collins v. Sears, Roebuck & Co., 321 A.2d 444, 449 (Conn. 1973) (internal citations and quotation marks omitted).

Connecticut's public policy concerning insurance policies like those here is not yet clear. Just four years ago, a

Connecticut Superior Court judge noted that Connecticut "ha[d] not yet ruled on the appellate level as to the viability of claims made policies[,] let alone such policies having no retroactive coverage." ITC Invs., Inc. v. Employers Reinsurance Corp., No. 98-115128, 2000 WL 1996233, *11 (Conn. Super. Ct. Dec. 11, 2000). This still appears to be true today.

The Connecticut Superior Court cases that have examined such provisions yield little guidance. To be sure, they tend not to view the provision as favorably as the Rhode Island court does. See id. at *10 (noting, with apparent incredulity, that "some jurisdictions are so enamored of claims made policies that they find nothing wrong with policies that require [that] the occurrence giving rise to the claim and the claim must [both] transpire within the policy period" and listing Gereboff as an example); Hartford Postal EFCU v. Colonial Penn Ins. Co., No. 93-0523600S, 1995 WL 79811, *2 (Conn. Super. Ct. Feb. 9, 1995) (concluding, on the unadorned basis that Murphy "made no distinction between 'claims made' and 'occurrence'" policies, that one-year reporting provision was not enforceable absent prejudice to the insurer). In the absence of more direct guidance from Connecticut courts, however, I must attempt to predict what result the Connecticut Supreme Court would reach.

Black & Decker argues that Reichhold Chemicals, Inc. v. Hartford Accident & Indemnity Co., 703 A.2d 1132 (Conn. 1997), signals that Connecticut would more likely follow New Jersey's lead. In Reichhold Chemicals, the question was whether

-20-

Connecticut should apply New York or Washington law to determine the defense of lack of timely notice.  Under New York law, lack of timely notice is a complete defense for the insurer; under Washington law, the insurer must prove prejudice.  <u>See id.</u> at 1134.  The Connecticut Supreme Court observed that "Connecticut notice law [which allows the insured to prove lack of prejudice], in effect, splits the difference between Washington law and New York law," but concluded that Connecticut law was closer to Washington law.  <u>Id.</u> at 1140.  It also noted Connecticut's "significant public policy interest in ensuring that funds are available for the cleanup of hazardous waste sites" and hence in avoiding rules that would result in forfeiture.  <u>Id.</u> at 1141.

<u>Reichhold Chemicals</u> establishes that Connecticut law is on the more "liberal" (i.e., favorable to insureds in technical breach of their obligations) side, but is not the most liberal. The problem is that the New York/Washington distinction on the issue of notice does not precisely map to the New Jersey/Rhode Island distinction on the issue of reporting provisions in occurrence policies.  After all, Rhode Island (the "strict" state for present purposes) has the same "liberal" rule as Washington on the question of notice.  <u>See</u> <u>Textron</u>, 639 A.2d at 1364-66; <u>Pickering v. Am. Employers Ins. Co.</u>, 282 A.2d 584, 593 (R.I. 1971) (adopting New Jersey rule, requiring insurer to prove prejudice, as "most persuasive").  Put differently, on the question of notice and prejudice, Connecticut is more liberal than New York but less liberal than Rhode Island, Washington, and

-21-

New Jersey.  Even if jurisdictions lined up neatly on a simple
one-dimensional continuum, I would have no basis for determining
whether Connecticut is no more liberal than Rhode Island (and
hence would enforce the reporting provision), more liberal than
Rhode Island but less liberal than New Jersey (in which case it
might somehow reform the provision into a notice requirement and
allow the insured to prove lack of prejudice), or as liberal as
New Jersey (in which case it would not enforce the provision at
all).

     It should now be clear that I cannot hold the provision
unenforceable.  Without a clear indication of how Connecticut
would resolve this precise question, Collins counsels that the
default presumption is "that competent persons shall have the
utmost liberty of contracting and that their agreements
voluntarily and fairly made shall be held valid and enforced in
the courts."  321 A.2d at 449.  Whether the provision makes the
insurance policy simply less desirable, or actually judicially
unenforceable, is a question of public policy upon which state
supreme courts can and do differ.  The opinions of other state
courts, and of unpublished Connecticut Superior Court decisions,
are useful only insofar as they persuade me, not how I myself
should rule were it a question of federal law, but how the
Connecticut Supreme Court would rule if presented with the
question.  Finding no opinion persuasive in this sense, I default
to the presumption that an insurance contract, like any other, is
valid.

I therefore hold that the one-year reporting provision is enforceable.  Because Black & Decker has not complied with it, no coverage is available under the 1961-67 policies.

2.    Accident/occurrence/damages

Liberty Mutual contends that the underlying complaints concerning the Ansonia and Derby sites do not allege an "occurrence" within the meaning of Farrel's 1967-71 policies.[5] Its principal argument is that the complaints simply allege pollution arising from Farrel's ordinary business operations, and do not specifically allege anything that would qualify as an occurrence.

Independently, I will also examine whether the complaints seek "damages . . . because of . . . property damage" as the policies require.  The Connecticut appellate courts have not yet decided whether environmental response costs qualify as "damages . . . because of . . . property damage," and lower courts differ. Compare REO, Inc. v. Travelers Co., No. 95-0372522S, 1998 WL 285836, at *16 (Conn. Super. Ct. May 20, 1998) (holding that cost of remediating pollution on third-party property qualifies as "damages") with Linemaster Switch Corp. v. Aetna Life & Cas. Corp., No. 91-0396432S, 1995 WL 462270, *22 (Conn. Super. July 25, 1995) (holding that it does not).  While I will assume

---

[5]I do not address the pre-1967 policies, because the reporting requirement was not satisfied, or the post-1971 policies, because of the pollution exclusion.  See infra Part D.3.

(without deciding) that <u>REO</u> is correct, I note that there are certain categories of relief sought that undoubtedly are <u>not</u> compensable damages under any interpretation.

    (a)  <u>Legal standard</u>

Under Connecticut law, an insurer's duty to defend is "much broader in scope and application than its duty to indemnify." <u>Cmty. Action for Greater Middlesex County, Inc. v. Am. Alliance Ins. Co.</u>, 757 A.2d 1074, 1081 (Conn. 2000) (internal quotation marks and citation omitted). "If an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." <u>Moore v. Cont'l Cas. Co.</u>, 746 A.2d 1252, 1254 (Conn. 2000) (internal quotation marks and citation omitted); <u>Palace Laundry Co. v. Hartford Accident & Indem. Co.</u>, 234 A.2d 640, 645 (Conn. C.P. 1967) (finding that insurer breached duty to defend where "although the allegations of the complaint on the issue of bodily injury caused by accident [were] possibly gossamer thin, there was at least the possibility that the plaintiff" in the underlying suit would prove that her injury resulted from a covered accident).

The duty to defend "does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage." <u>Cmty. Action</u>, 757 A.2d at 1081. The insurer can avoid the duty to defend only by "demonstrat[ing] that the allegations in the underlying

complaints are 'solely and entirely' within specific and unambiguous exclusions from the policy's coverage." EDO Corp. v. Newark Ins. Co., 898 F. Supp. 952, 961 (D. Conn. 1995) (quoting Avondale Indus., Inc. v. Travelers Indem. Co., 887 F.2d 1200, 1204-05 (2d Cir. 1989), cert. denied, 496 U.S. 906 (1990)). Moreover, the "complaint need not negate each and every exclusion within a policy in order to trigger a contractual obligation to defend." Schwartz v. Stevenson, 657 A.2d 244, 247 (Conn. App. Ct. 1995).

"The existence of a duty to defend is determined on the basis of what is found within the four corners of the complaint; it is not affected by facts disclosed by independent investigation, including those that undermine or contradict the insured party's claim." Stamford Wallpaper Co. v. TIG Ins., 138 F.3d 75, 79 (2nd Cir. 1998) (internal quotations omitted). However, "by the same token, [the court] will not hypothesize or imagine episodes or events that cannot be found among the allegations, and cannot reasonably be deduced from them." Id. at 81.

Although the term "accident" is not defined in the policies, the Connecticut courts have defined it as "'an event or condition occurring by chance or arising from unknown or remote causes; lack of intention or necessity; an unforeseen unplanned event or condition.'" DaCruz v. State Farm Fire & Cas. Co., 794 A.2d 1117, 1123 (Conn. App. Ct. 2002) (quoting Webster's 3d New Int'l

Dictionary), <u>rev'd on other grounds</u>, 846 A.2d 849 (Conn. 2004).
The term "accident" is not limited to events of pure chance, but
also encompasses damage sustained as the result of negligent
acts. <u>Id.</u> (holding that the negligent use of excessive and
unreasonable force constituted an accident or occurrence.)
"Occurrence," in turn, means "'something that takes place,'
especially 'something that happens unexpectedly without design.'"
<u>Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.</u>, 765 A.2d 891, 898
(Conn. 2001) (quoting <u>Dicola v. Am. S.S. Owners Mut. Prot. &
Indem. Ass'n, Inc.</u>, 158 F.3d 65, 76 (2d Cir. 1998)).

Finally, it appears that unintended consequences of intended
acts are not themselves "expected or intended."  In <u>Linemaster</u>,
the court held that the only damage that can be excluded as
"expected or intended" is the specific type of damage alleged in
the suit against the insured:

> When toxins or pollutants are involved it cannot be
> said a priori that the risk of one specific type of
> damage necessarily implicates a risk of other or all
> possible types of damage that may be caused by the
> pollutant. . . . [I]t is clear that the "bodily injury
> or property damage" that must be neither "expected or
> intended" if there is to be coverage is the "bodily
> injury or property damage" which the insured "shall
> become legally obligated to pay" -- that is the damages
> that are sought in the suit against the insured. . . .
> In determining whether "property damage" is "expected
> or intended" I do not agree that the nature of the
> environmental harm is immaterial if the nature of that
> harm does not form the basis of the bodily injury or
> property damage claim against the insured.

1995 WL 462270, at *26.  In short, the fact that the insured may
have expected <u>some</u> damage -- e.g., staining or rusting of the

-26-

soil -- does not, without more, lead to the ineluctable inference
that the insured expected the damage that is at issue in the
case.  See also Palace Laundry, 234 A.2d at 644-45 (favorably
citing J. D'Amico, Inc. v. City of Boston, 345 Mass. 218, 223-24
(1962), and Koehring Co. v. Am. Auto. Ins. Co., 353 F.2d 993, 996
(7th Cir. 1965), both of which hold that unintended consequences
of intended acts can qualify as "accidents").

    (b)    SHW Action

    The SHW Action alleged breach of contract and indemnity
agreement, violation of the Connecticut Transfer Act, negligent
misrepresentation, negligent misrepresentation, intentional
misrepresentation, fraud, reimbursement for containment or
removal costs under Conn. Gen. Stat. § 22a-452, and violation of
the Connecticut Unfair Trade Practices Act.

    It should be fairly obvious that the common law and
statutory counts sounding in contract and various species of
misrepresentation in the transfer of property do not trigger the
duty to defend.  That duty applies to "any suit against the
insured seeking damages on account" of "property damage."  (E.g.,
Defs.' App. IV at 170.)  Suits seeking recovery on the basis of
contractual theories, unfair trade practices, or
misrepresentations in the course of sale do not seek damages on
account of property damage under even the most generous
interpretation of that phrase.  Cf. Smartfoods, Inc. v.
Northbrook Prop. & Cas. Co., 35 Mass. App. Ct. 239, 241 (1993)

("[I]t requires a flight of the imagination to suppose that when [the insured] bought general liability insurance it expected that the policy would cover legal expenses incident to what . . . is at its core a breach of contract suit.").

The Connecticut Transfer Act claim also falls short.  A seller that violates that Act -- most commonly, by falsely certifying either that there were no discharges on the property, or that any discharges have been remediated -- is "strictly liable, without regard to fault, for all remediation costs and for all direct and indirect damages."  Conn. Gen. Stat. § 22a-134b; see also id. §§ 22a-134(10)-(11), 22a-134a(c).  But the essential allegation underlying a Connecticut Transfer Act claim is not that third-party property has been damaged by an act of pollution, but rather that the seller has not taken the proper regulatory steps of disclosure, investigation, and/or remediation prior to sale.  Thus, a Connecticut Transfer Act claim does not trigger the duty to defend.

However, the cause of action under Conn. Gen. Stat. § 22a-452 prays for Emhart and USM to "reimburse SHW for the reasonable costs expended by it to contain, remove or otherwise mitigate the effects of the contamination."  (Defs.' App. XXXIV at 95 ¶ 40.)  While Connecticut courts have not finally resolved whether cleanup and response costs are damages on account of property damage, I find the majority view -- that they are -- to be most persuasive and likely to be adopted by the Connecticut Supreme Court; I thus find that the cause of action under § 22a-

-28-

452 meets the "damages" requirement.

The complaint adequately alleges an occurrence.  Under §
22a-452, "[a]ny [entity] . . . which contains or removes or
otherwise mitigates the effects of oil . . .[,] solid, liquid or
gaseous products or hazardous wastes resulting from any
discharge, spillage, uncontrolled loss, seepage or filtration of
such substance or material or waste shall be entitled to
reimbursement . . . for the reasonable costs expended for such
containment, removal, or mitigation, if such . . . pollution or
contamination or other emergency resulted from the negligence or
other actions of [the defendant]."  Conn. Gen. Stat. § 22a-
452(a).  Count V of the complaint (alleging a right to
reimbursement under Conn. Gen. Stat. § 22a-452) incorporates by
reference the factual allegations of Count I (alleging breach of
contract and indemnity agreement).  Those allegations only state
that the site and groundwater beneath it "were contaminated with
heavy metals, polychlorinated biphenyls and other pollutants,"
and that the site's former owners "caused the contamination."
(Defs.' App. XXXIV at 90 ¶¶ 18, 21.)  Count V itself alleges that
"Emhart/USM is responsible for the contamination."  (Id. at 95 ¶
29.)

This might appear to be strained, but Conn. Gen. Stat. §
22a-452 requires evidence of "negligence or other actions," and
is not a strict liability statute.  Conn. Gen. Stat. §
22a-452(a); Schiavone v. Pearce, 79 F.3d 248, 256 (2d Cir. 1996);
Conn. Res. Recovery Auth. v. Refuse Gardens, Inc., 642 A.2d 762,

764-66 (Conn. Super. Ct. 1993).  Because an occurrence includes

the unintended consequences of intended acts, Count V is

reasonably susceptible to the interpretation that SHW alleged

negligent contamination that would constitute an "occurrence"

under the policies.

To be sure, Conn. Gen. Stat. § 22a-452(a)'s culpability

standard could also be satisfied by a level of intent higher than

negligence -- i.e., a level that might be too high to give rise

to an occurrence).  However, "[i]f an allegation of the complaint

falls even possibly within the coverage, then the insurance

company must defend the insured."  Moore, 746 A.2d at 1254 (Conn.

2000) (internal quotation marks omitted).  In REO, the court

found that an occurrence had been alleged based on underlying

allegations similar to those here:

> The underlying complaint against the plaintiffs pleads
> within the policies' coverage by alleging property
> damage to the state's water supply: "hazardous
> substances [were discharged] into the environment,
> including . . . the waters of the state . . . ."  The
> underlying complaint also satisfies the policy
> provision requiring that such damage result from an
> occurrence that was an "accident, including continuous
> or repeated exposure to a condition not expected or
> intended," for the underlying complaint alleges that it
> occurred as a result of the plaintiffs' "negligent and
> reckless misconduct."

1998 WL 285836, at *6 (alterations in original).

While in some sense the allegations here are "gossamer

thin," Palace Laundry, 234 A.2d at 645, they sufficiently allege

an occurrence for duty to defend purposes.[6]

    (c)  <u>New Farrel Actions</u>

The New Farrel state complaint, both as initially filed and as amended, alleged fraud, misrepresentation, violations of the Connecticut Transfer Act, breach of contract, and violations of the Connecticut Unfair Trade Practices Act.  (Defs.' App. XXXIV at 28-35, 36-42.)  These would not trigger the duty to defend, because they do not seek damages on account of property damage as required by the policies.  Thus, I find that Liberty Mutual had no duty to defend Black & Decker against the New Farrel state complaint.

However, New Farrel's federal complaint alleged a right to cost recovery and contribution under CERCLA, which could qualify. (Defs.' App. XXXIV at 44-57.)  The amended federal complaint added state law counts of fraud, misrepresentation, negligent misrepresentation, violations of the Connecticut Transfer Act, breach of contract, violations of the Connecticut Unfair Trade Practices Act, and a right to recovery under Conn. Gen. Stat. §§ 22a-451 & 22a-452.  (<u>Id.</u> at 58-83.)  Of these, only the Conn. Gen. Stat. §§ 22a-451 & 22a-452 counts could trigger the duty to defend.

---

[6]Liberty Mutual also contends that it had no duty to defend under any of the Farrel policies because none of the suits named Farrel as a defendant.  Since Farrel no longer existed when the suits were brought, and since Black & Decker has succeeded in interest to the Farrel policies, this argument is meritless.

The factual allegations underlying the federal complaints state that "as a result of USM's operations, hazardous substances were spilled, released or disposed of into the environment from the Ansonia and the Derby Premises." (Defs.' App. XXXIV at 63-64.)  The "operations" referred to included, <u>inter alia</u>, degreasing, scrap metal storage, storage of wastes in drums, tank storage of diesel fuel, disposal of slag and foundry wastes for fill, waste oil disposal, and cleaning of equipment sent to Derby for repair.  (<u>Id.</u> at 64-65.)  The complaint alleged resulting releases at various locations at the Ansonia and Derby sites, including tail races.  (<u>Id.</u> at 63-65.)

As with the SHW complaint, I find that the New Farrel federal complaint properly alleges an occurrence.  While it does not specifically allege that the releases were unexpected and unintended, the allegations are "possibly within the coverage," <u>Moore</u>, 746 A.2d at 1254, and this suffices.

3.  <u>Pollution exclusion</u>

Farrel's July 1, 1971 to November 1, 1971 policy included a pollution exclusion.  USM's policies that covered the Ansonia and Derby sites from November 1, 1971 through January 1, 1979 (when coverage was terminated) contain the same exclusion.  These two insureds are governed under different states' laws.  However, the respective legal principles are parallel.

Both Connecticut and Massachusetts hold that the "sudden and accidental" exception requires a temporally abrupt release.  <u>See</u>

-32-

<u>Buell Indus. Inc. v. Greater N.Y. Mut. Ins. Co.</u>, 791 A.2d 489,
496 (Conn. 2002); <u>Lumbermens Mut. Cas. Co. v. Belleville Indus.</u>,
407 Mass. 675, 680-681 (1990).  The insured must demonstrate that
the allegations of the complaint can be reasonably interpreted to
allege a sudden and accidental release, or that extrinsic
evidence shows that the discharge was in fact sudden and
accidental; speculation is not indulged.  It is plain that the
complaints do not allege any sudden and accidental releases, and
that any releases at the sites that <u>were</u> sudden and accidental
were "de minimis," <u>Highlands Ins. Co. v. Aerovox Inc.</u>, 424 Mass.
226, 235 (1997), or "legally insignificant," <u>Linemaster</u>, 1995 WL
at *33.  Therefore, I find that the pollution exclusion bars
coverage after July 1, 1971.

    4.  <u>Owned property exclusion</u>

    Liberty Mutual argues that, because none of the complaints
allege damage to third-party property, the owned property
exclusion must therefore bar coverage.  Black & Decker responds
that groundwater is third-party property for purposes of the
owned property exclusion, and that this suffices to defeat it.

    (a)  <u>Legal standard</u>

    Liberty Mutual has the burden of proving that no harm to
third-party property was alleged.  <u>See</u> <u>REO</u>, 1998 WL 285836, at *8
(an insurer that seeks to deny litigation defense coverage based
on an exclusionary clause "has the burden of demonstrating that
the allegations of the complaint cast the pleading solely and

entirely within the policy exclusions" (internal quotation marks
omitted)).  Since there is no direct allegation of harm to any
other third party property, the question is whether groundwater
qualifies as third party property for the purpose of this
exclusion.

While the Connecticut Supreme Court has not addressed this
question, one state court case and two federal district court
cases provide sufficient guidance.  In REO, the underlying
complaint alleged that hazardous waste had been discharged on and
around the site of the insured's manufacturing plant and had or
was likely to "pollute[], impair[] or destroy[] the public trust
in the water or other natural resources of the state."  1998 WL
285836, at *1.  The court held that damage to groundwater falls
outside of the owned property exclusion because the groundwater
is not owned by the insured.[7]  Id. at *8.  It cited numerous
cases from other jurisdictions holding that "damage to
groundwater is not damage to property owned or occupied by or
rented [to the insured]."  Id. (quoting Intel Corp. v. Hartford
Accident & Indem. Co., 952 F.2d 1551, 1565 (9th Cir. 1991)).

_____

[7]Liberty Mutual contends that this language refers to water
on state land as opposed to mere groundwater which is privately
owned.  I do not find this consistent with the reasoning of the
case.  The reference in Connecticut statutes and case law to "the
waters of the state" covers all water resources in the state
including "all . . . surface or underground streams, bodies or
accumulations of water, natural or artificial, public or private,
which are contained within, flow through or border upon this
state or any portion thereof."  Conn. Gen. Stat. § 22a-423.

Two more recent federal district court cases help develop the state of Connecticut law.  In United Technologies Corp. v. American Home Assurance Co., 989 F. Supp. 128, 145-47 (D. Conn. 1997), the court held, for purposes of an all-risk property insurance policy, that groundwater was not the insured's property.  In reaching this decision, it relied in large part on decisions addressing that question for purposes of the owned property exclusion in liability insurance.  See id. at 146-47.

A more recent federal case, Yale University v. CIGNA Insurance Co., 224 F. Supp. 2d 402 (D. Conn. 2002), requires somewhat closer analysis, but can be reconciled with REO.  In Yale University, the insured was ordered by government authorities to remediate asbestos and lead paint hazards in its buildings.  It sought coverage under liability policies, arguing that the hazardous conditions had the potential to migrate into third-party property including, inter alia, groundwater.  See id. at 407-10.  The court noted that various courts in other jurisdictions had found an exception to the owned property exclusion for threatened harm to groundwater, but stated that those decisions "ignore[d] the plain language of the policies" and declared them "fundamentally inconsistent with established Connecticut law" of policy interpretation.  Id. at 408.[8]  But it ultimately rested its decision on the ground that, on the facts

---

[8]The Yale University court did not mention REO or United Technologies in this context, though it did cite them on other points.

of that case, there was simply no evidence whatsoever that the lead and asbestos had presented a risk to groundwater, or that the underlying government directive had suggested that they might.  Id. at 409-10.  I treat those portions of Yale University that are inconsistent with REO and United Technologies as dicta, and accept the court's own view that the "[m]ore important[]" ground for its decision was the insured's failure to establish any harm or threat of harm to groundwater.  See id. at 409.

Reading REO, United Technologies, and Yale University together, I hold that, under Connecticut law, an insured may escape the owned-property exclusion by demonstrating actual or threatened harm to groundwater.

(b)  Application

The SHW complaint and the New Farrel state complaint contain identical allegations that "certain of the Premises and Assets in the groundwater beneath the Premises and Assets were contaminated with heavy metals, polychlorinated biphenyls and other pollutants."  (Defs.' App. XXXIV at 31 ¶ 11, 90 ¶ 18.)  This clearly alleges harm to groundwater, and therefore these complaints are not barred by the owned property exclusion.

The New Farrel federal complaint, however, does not mention groundwater.  Black & Decker argues that an allegation that "hazardous substances were spilled, released or disposed of into the environment" encompasses harm to groundwater. (See First New Farrel Federal Complaint, Defs.' App. XXXIV at 50 ¶ 23; Amended

New Farrel Federal Complaint, id. at 63 ¶ 21 (emphasis added).)
Liberty Mutual responds that this requires the court to speculate
improperly as to whether the allegations state a claim of damage
to third-party property.

While it is true that the New Farrel federal complaint does
not mention the term "groundwater," the inquiry is not completed
by that observation.  "Environment" is a term with a specific
definition under CERCLA, which grounds the main cause of action
in the New Farrel federal complaint.[9]  New Farrel specifically
alleged that "the hazardous substances spilled, released or
disposed of into the environment from the Ansonia and Derby
[sites] . . . constitute a 'release' or threat of a 'release,' as
defined by 42 U.S.C. § 9601(22)."  (Defs.' App. XXXIV at 54 ¶ 39;
id. at 68 ¶ 37.)  The allegation of release into the environment
therefore cannot be fully understood without reference to
CERCLA's definition of "environment":

> (A) the navigable waters, the waters of the contiguous
> zone, and the ocean waters of which the natural
> resources are under the exclusive management authority
> of the United States . . . , and (B) any other surface
> water, ground water, drinking water supply, land
> surface or subsurface strata, or ambient air within the
> United States or under the jurisdiction of the United
> States.

42 U.S.C. § 9601(8) (emphasis added).

Clearly, the term "the environment" might or might not

---

[9]In the first New Farrel federal complaint, CERCLA provided
the only cause of action.

include groundwater.  Liberty Mutual quotes <u>Stamford Wallpaper</u>
and <u>Schilberg Integrated Metals Corp. v. Continental Casualty
Co.</u>, 819 A.2d 773, 786 (Conn. 2003), to the effect that the court
cannot hypothesize facts that might be consistent with an
allegation.  However, both of those cases dealt with the "sudden
and accidental" exception to the pollution exclusion, as to which
the <u>insured</u> bears the burden of proof.  By contrast, the <u>insurer</u>
has the burden of proving that an exclusion (such as the owned
property exclusion) applies.  <u>Stamford Wallpaper</u>, 138 F.3d at 79;
<u>Buell Indus.</u>, 791 A.2d at 504.  In this context, for purposes of
the duty to defend, the allegation of harm to "the environment"
suffices.  The "complaint need not negate each and every
exclusion within a policy in order to trigger a contractual
obligation to defend," <u>Schwartz</u>, 657 A.2d at 247, and if an
allegation "falls even possibly within the coverage," the insurer
must defend, <u>Moore</u>, 746 A.2d at 1254.

I find, as a matter of law, that the allegation of harm to
"the environment" falls "possibly" within the coverage that would
apply to an allegation of harm to groundwater.  Therefore, the
owned property exclusion does not apply to the New Farrel federal
complaint.

5.  <u>Late notice</u>

The policies require written notice of the particulars of an
occurrence "as soon as practicable," and of a claim or suit
"immediately."  Liberty Mutual contends that both of these

provisions were violated.  I assume for present purposes that the only occurrences at issue are those between July 1, 1967 and July 1, 1971.  If either notice provision was violated, Black & Decker bears the burden of proving that Liberty Mutual was not prejudiced by the delay.  See Murphy, 538 A.2d at 224; Taricani v. Nationwide Mut. Ins. Co., 822 A.2d 341, 341 (Conn. App. Ct. 2003).[10]

    (a)  Timeliness

Notice must be given within a reasonable time after "facts develop which would suggest to a person of ordinary and reasonable prudence that liability may have been incurred," i.e., that "the situation so assumes an aspect suggestive of a possible claim for damages."  Silver v. Indem. Ins. Co. of N. Am., 79 A.2d 355, 357 (Conn. 1951).  Because there is no evidence in the record concerning when Black & Decker first became aware of the environmental harm at the Ansonia and Derby sites, I assume that it became aware when the first lawsuit against it was filed.

The subsequent chronology can be summarized as follows:

---

[10]Liberty Mutual also argues that Black & Decker failed to formally tender the New Farrel federal court action by specifically requesting a defense.  However, the contract does not require the insured to specifically request a defense, and Connecticut does not require the insured to do so, so long as the insurer has actual notice of the claim.  See City of West Haven v. Liberty Mut. Ins. Co., 639 F. Supp. 1012, 1018 (D. Conn. 1986) ("Connecticut law does not require that an insured ask for a defense. . . . [or] that an insured must expressly ask for a defense in addition to satisfying the conditions precedent to receiving a defense under the applicable policy language.").

Black & Decker formally notified Liberty Mutual of the SHW complaint almost two years after it was filed, and the New Farrel state complaint some seven months after it was filed. Finally, Liberty Mutual had actual notice of the New Farrel federal complaint by July 1993, almost three years after it was filed.[11]

These delays are too long under Connecticut law. <u>Cf.</u> <u>United Techs.</u>, 989 F. Supp. at 140 (sixteen month delay unreasonable); <u>City of West Haven v. U.S. Fid. & Guar. Co.</u>, 389 A.2d 741, 745 (Conn. 1978) (two month delay unreasonable). Here, even if I assume that Black & Decker had no knowledge of the occurrence until it received the complaints, notice was still not given for some seven months. I find that, as a matter of law, Black & Decker's notice to Liberty Mutual was late for all three complaints.

(b)  <u>Prejudice</u>

The next question is whether Black & Decker can demonstrate that Liberty Mutual suffered no prejudice from the delay. While Black & Decker has the burden of proving lack of prejudice, Liberty Mutual has at least a burden of production of stating how, in its view, it was prejudiced:

For purposes of summary judgment, it is not sufficient

---

[11]Black & Decker suggests that Liberty Mutual had "constructive notice" as soon as it received the New Farrel state complaint, because it could have (e.g.) requested an annual status report from Black & Decker concerning the state case, and if it had so requested, Black & Decker would have mentioned the federal case. Such counterfactual speculation is inappropriate for summary judgment.

> for [the insurer] to merely state it was prejudiced
> without specifically identifying how it was prejudiced
> and articulating with greater precision why [the
> insured's] documentation is insufficient to cure such
> prejudice.  [The insurer]'s general reference to having
> difficulty reconstructing the cause of the
> contamination is insufficient to establish the
> necessary causal relationship.

United Techs., 989 F. Supp. at 141.  Liberty Mutual has conceded

that it cannot offer anything that it would have done differently

had it received earlier notice.  Nevertheless, it argues that in

Connecticut prejudice is presumed, and seeks to put Black &

Decker to its proof.  I will proceed on the assumption that

Liberty Mutual need not identify any grounds for prejudice.

    Black & Decker's arguments fall into two rough categories.

First, the "merit-based" arguments assert that: (1) the terms of

the settlements themselves provided that the actual cost of

remediation would be determined over a period of years as

remediation progressed, which gives Liberty Mutual an ongoing

opportunity to participate in investigations and dealings with

regulatory authorities concerning the scope of remediation; (2)

the settlements themselves were fair and reasonable; and (3)

there is no lost or missing evidence involved at the sites.

Next, the "history-based" arguments assert that: (1) there would

have been no impact on Liberty Mutual's coverage position had it

known of the claims; and (2) the actual history of how Liberty

Mutual handled the claims once it did have notice -- to be blunt,

it did virtually nothing -- suggests that it would not have

undertaken any investigation or other activity that would have

put it in a better position than it is in now.

(i)  Merit-based arguments

Black & Decker argues that the settlements -- negotiated on its behalf by a respected law firm  -- were fair and reasonable given the facts, and furthermore allow Black & Decker (and, should it choose, Liberty Mutual) to protect against excessive costs.  (See SHW Settlement, Defs.' App. XCVI, Ex. C, at 4, 6; New Farrel Settlement, Defs.' App. XCVI, Ex. D, at 4-6.)  The New Farrel settlement explicitly limits Black & Decker's responsibility to remediation attributable to contamination before May 1986, and gives Black & Decker the lead role in dealing with the Connecticut Department of Environmental Protection and performing the remediation.  The SHW settlement gives SHW the lead role for the actual remediation, but tightly circumscribes the expenses for which Black & Decker will be liable, provides fixed cost caps in several areas, and provides an arbitration procedure by which Black & Decker (and Liberty Mutual) can challenge individual expenses as excessive.

For both agreements, the overall framework is reasonable in light of the circumstances and underlying legal regime, and provides adequate opportunity for oversight to prevent unreasonable expenses.  Furthermore, there is no suggestion that any material evidence was lost during the intervening months or years of delay.  Finally, while the notice was indeed late, there was sufficient time between Liberty Mutual's receipt of actual notice and the entry of settlement to, at minimum, pick up the

phone and tell Black & Decker to hold off while Liberty Mutual investigated the claim.

(ii) <u>History-based arguments</u>

The history of what Liberty Mutual <u>did</u> do when it eventually received notice is somewhat illuminating regarding what it might have done had notice been more timely.  Black & Decker provided notice of the SHW and New Farrel state complaints in January 1990.  After an exchange of correspondence during 1990 -- including a request by Liberty Mutual for Black & Decker to resend copies of the two complaints, which Liberty Mutual had apparently misplaced -- no more was heard from Liberty Mutual for well over a year.  On January 20, 1992 Black & Decker wrote to Liberty Mutual requesting "a determination on the part of Liberty Mutual as to their position regarding defense of this matter." (Defs.' Supp. Submission Regarding the Newly Raised Issues of Tender and Notice/Prejudice, Ex. A at 34233.)  Liberty Mutual did not respond for over two years, until it denied coverage on June 14, 1994.  (Defs.' App. XXXIV at 215-20.)  Moreover, its coverage denial letter listed every count of the underlying complaints <u>except</u> those alleging claims under Conn. Gen. Stat. §§ 22a-451 & 22a-452, the Connecticut counterparts to CERCLA.  (<u>See</u> Defs.' App. XXXIV at 216.)  Whether deliberate or not, this omission casts doubt on the idea that Liberty Mutual was particularly prejudiced by not learning of the CERCLA counts in the New Farrel federal complaint, since its response to analogous counts in the

SHW and New Farrel state complaints was to ignore them.

It cannot be said that Liberty Mutual's lack of response was on the principled ground that it had already determined that there was no duty to defend because of late notice: the coverage denial letter did not mention late notice at all.  Rather, the delays appear to have been due to inefficiency and disarray.  As Black & Decker rightly notes, during the four and a half years between receiving notice of the SHW and New Farrel state complaints and its eventual denial of coverage, Liberty Mutual took no substantive action concerning the file.  Rather, it: twice misplaced the file; lost the complaints; as much as a year after receiving requested information, had not reviewed that information; and bounced the claim around between four different claims representatives and three different offices.  (Defs.' Supp. Submission Regarding the Newly Raised Issues of Tender and Notice/Prejudice, Ex. A at 34203-235, 34403-05.)  Even Liberty Mutual recognized that the file was languishing.  (Id. at 34232, 34403.)

Taken together, these facts establish, as a matter of law, that Liberty Mutual was not prejudiced by the delay.  Addressing an analogous (if less disordered) circumstance, a federal district court in Connecticut found that the insured had met its burden of showing lack of prejudice:

> Most probative of this question is Central National's
> failure to take any action whatsoever when it received
> notice in November 1986.  The court finds that the time
> between this first receipt of notice and the settlement

> of the Falls claim in May 1987 constituted ample
> opportunity for participation with Travelers. Since
> Central National chose <u>not</u> to participate when given a
> chance to do so, it cannot now claim that it was
> prejudiced by not being given that chance earlier.

<u>Travelers Ins. Co. v. Cent. Nat'l Ins. Co. of Omaha</u>, 733 F. Supp.

522, 530 (D. Conn. 1990) (judgment after bench trial) (emphasis

in original); <u>cf.</u> <u>Arrow Auto. Indus., Inc. v. Liberty Mut. Ins.</u>

<u>Co.</u>, No. 94-0847, 8 Mass. L. Rptr. 225, 1998 WL 52274, *10 (Mass.

Super. Ct. Jan. 29, 1998) (finding insurer had not met its burden

under Massachusetts law of proving prejudice, where "[t]he

likelihood that Liberty would have conducted that level of

factual investigation seems particularly low, given the response

Liberty actually made when Arrow finally did notify it").

This "do-nothing factor" distinguishes <u>SNET v. Zurich</u>

<u>American Insurance Co.</u>, No. 01-0456771, 2003 WL 21213385 (Conn.

Super. Ct. May 15, 2003), where the court granted summary

judgment to the insurer on the basis of failure to dispel the

presumption of prejudice.  There, the insurer was immediately

proactive and responsive once it received notice.  The insured

gave notice of the claim and requested a defense just seven days

before a pretrial conference, but the insurer sent a

representative to that conference and successfully requested a

forty-five day continuance.  <u>Id.</u> at *1.  The <u>SNET</u> court noted

that the delay of notice covered nearly the entire period of

pretrial discovery and preparation:

> More than three years passed from initiation of
> lawsuits to notification of the defendant.  In most
> civil cases that is a long time.  That is time during

-45-

which discovery is conducted, investigations are
undertaken and strategic decisions are made.  Once
those things occur, the positions of the parties become
fixed.  The late notice meant that the defendant did
not have the opportunity to assist the plaintiff in
making any tactical decisions in preparation for trial
or to prepare any of its own evidence.  Had the insured
provided notice within the first year, this would be a
different case. Notification in the second year would
have still allowed time for depositions and relevant
Independent Medical Examinations.  By year three,
however, the case was on track for trial, and discovery
opportunities were long gone.  Additionally, the fact
that the trial date had been set at the time of
notification precludes opportunities, otherwise
available to the parties to develop the case.

Id. at *4.  In short, in SNET the insurer had no opportunity to

involve itself in the pretrial process, but when it did receive

notice, it sent a lawyer to a hearing on a week's notice.  By

contrast, here Liberty Mutual received notice on two of the three

complaints well before trial, and when it received notice, it did

virtually nothing.  The SNET court noted that "[h]ad the insured

provided notice within the first year, this would be a different

case," and "[n]otification in [even] the second year would have

still allowed time" for investigation.  Id.  For the SHW and New

Farrel state cases, notice was provided after two years and seven

months respectively.  The New Farrel federal complaint came much

later, but Liberty Mutual's failure to involve itself in the

other two claims both distinguishes this case from SNET and

establishes that Liberty Mutual was not actually prejudiced by

the late notice of any of the three.

Therefore, I find that, while notice of all three claims was

unreasonably late, Black & Decker has demonstrated, as a matter

of law, that Liberty Mutual was not prejudiced by the delay.

-46-

6.   Duty to indemnify

Because Liberty Mutual breached its duty to defend Black &
Decker, the duty to indemnify is essentially automatic.  Under
Connecticut law, an insurer that has breached the duty to defend
is not "permitted to seek the protection of [the policy] in
avoidance of its indemnity provisions.  Nor [is it] permitted, by
its breach of the contract, to cast upon the [insured] the
difficult burden of proving a causal relation between the
[insurer]'s breach of the duty to defend and the results which
are claimed to have flowed from it."  Black v. Goodwin, Loomis &
Britton, Inc., 681 A.2d 293, 298-99 (Conn. 1996) (quoting
Missionaries of the Co. of Mary v. Aetna Cas. & Sur. Co., 230
A.2d 21, 26 (Conn. 1967).  Under the Missionaries rule, "[w]here
an insurer is guilty of a breach of its contract to defend, it is
liable to pay to the insured not only his reasonable expenses in
conducting his own defense but, in the absence of fraud or
collusion, the amount of a judgment obtained against the insured
up to the limit of liability fixed by its policy."  Keithan v.
Mass. Bonding & Ins. Co., 267 A.2d 660, 666 (Conn. 1970);
Missionaries, 230 A.2d at 26.  Similarly, the insured that has
breached its duty to defend must pay any reasonable settlement
agreed to between the plaintiff and the insured.  Black, 681 A.2d
at 299.

Liberty Mutual seeks to avoid the Missionaries rule on the
grounds that some of Black & Decker's defense costs were paid by

Aetna.  Missionaries does not apply if the insured has been
defended by a different insurer.  Sacharko v. Ctr. Equities Ltd.
P'ship, 479 A.2d 1219, 1223-24 (Conn. App. Ct. 1984).  Under
Sacharko, other insurers are simply "required to contribute their
pro rata share of the cost of defense."  Id. at 1224.  To apply
Missionaries where the insured was actually defended, albeit by a
different insurer, would "convert a rule of compensation for loss
into an opportunity for windfall."  Id.

     However, this case is distinguishable from Sacharko.  There,
the other insurer actually defended the insured.  Id. at 1221.
Here, while the record is somewhat unclear, it appears that Aetna
did not actually defend Black & Decker.  Rather, Black & Decker
was left to fend for itself for some period of time, and Aetna
later settled a claim of breach of duty to defend by paying
litigation costs incurred through August 31, 1994.  (Cook Dep.,
Pl.'s App. 28, Tab 5, at 93; Defs.' App. XXIV at 36 ¶ 125.)

     There is a world of difference, both practical and legal,
between fulfilling a contractual duty, and paying damages for the
breach of that duty.  Had Aetna actually defended Black & Decker,
this might be a different case.  As it stands, the fact that
Aetna eventually paid some of the litigation expenses does not
mean that Black & Decker is in as good a position as it would
have been if Aetna, let alone Liberty Mutual, had actually
defended it.

     Nor is it relevant that Missionaries involved nuns who were

unable to afford a lawyer, while Black & Decker could, at least
temporarily, cover its own litigation expenses.  The <u>Missionaries</u>
doctrine -- that an insurer must provide a timely defense, upon
request, or else face the prospect of automatic liability for the
duty to indemnify -- does not contain a "large company"
exception.

I find that <u>Missionaries</u> and its progeny apply on these
facts.  I will therefore grant Black & Decker's motion for
summary judgment on the duty to indemnify under the 1967-71
Farrel policies.  This may be a harsh consequence for failing to
defend a complaint that, in some respects, just barely meets the
occurrence requirement and avoids the owned property exclusion.
But that is the teaching of <u>Missionaries</u>: an insurer that fails
to defend does so at considerable peril.

**E.    Conclusion**

Liberty Mutual's motion for partial summary judgment is
GRANTED for the 1961-67 Farrel policies that contain the one-year
reporting provision, and for the 1971-79 Farrel and USM policies
that contain the pollution exclusion.

Liberty Mutual's motion is GRANTED for the New Farrel state
complaint, to the extent (if any) that the duty to defend Black &
Decker against that complaint is separable from the duty to
defend the New Farrel federal complaint, because the state
complaint did not seek "damages" under the policies.

Black & Decker's motion for partial summary judgment is

GRANTED for the SHW complaint and the New Farrel federal complaint under the 1967-71 Farrel policies, as to both the duty to defend and the duty to indemnify.

Both parties' motions are DENIED to the extent not explicitly granted above.


/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE