UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) C.A. No. 96-10804-DPW ) ) |
| v. | ) C.A. No. 1:04-CV-10651-DPW ) (Ansonia & Derby Sites) |
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART, INC., | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

AFFIDAVIT OF RODNEY J. TAYLOR

Rodney J. Taylor deposes and says:

1. I am a Managing Director of Breitstone & Co., Ltd. of Cedarhurst, New York ("Breitstone"). Breitstone is a risk and insurance management firm that provides insurance brokerage and consulting services to a wide range of industrial, commercial and institutional clients. It assists such entities in addressing construction, environmental and energy related risks.

2. I hold professional insurance designations, including Charter Property and Casualty Underwriter (CPCU), Charter Life Underwriter (CLU) and Associate in Risk Management (ARM). A more detailed statement of my professional qualifications and experience is set forth in my curriculum vitae, a copy of which is attached herewith as Exhibit A.

3. I have more than thirty years of experience in environmental risk management and insurance. My attached resume details my professional activities and experience in

connection with insurance programs for environmental risks, including the development and implementation of insurance programs to address such risks. I have had professional experience in various aspects of the insurance industry, including rating, drafting of insurance policy language, negotiation of policy provisions and endorsements, and the administration of claims. I have worked with clients to develop insurance and risk management solutions for CERCLA, RCRA and other types of environmental exposures involving both statutory and tort liability. This has included the development of environmental insurance forms to meet the specific needs of clients with environmental risk issues. I have accumulated knowledge as a broker concerning US.-domiciled and London insurers active in writing general liability as well as environmental insurance risks. In connection with these professional activities, I have developed a comprehensive understanding and knowledge of insurance available for U.S. industrial accounts to cover environmental pollution and other similar types of insurance risks in the period from 1970 through the present.

    4.    My activities as an insurance broker have included the assembly and maintenance of an extensive library of insurance forms and other materials related to insurance and risk management. It includes information concerning available insurance, underwriting techniques and risk management approaches utilized by industrial accounts to address general liability and environmental liability risks for the period starting from 1970 to the present. This library includes copies of insurance policies and applications, descriptive materials, and underwriters' explanations of the coverage provided by their policies. It also includes documents that describe the origins of environmental insurance and its development for U.S. industrial risks. The library has been kept up to date with the addition of materials as the market for environmental insurance has continued to evolve. Materials included in the library are utilized to provide alternatives to

current clients that are seeking to utilize state–of-the-art wording for specific property, casualty and environmental risks, and to provide materials for research into past practices in underwriting and insuring these risks. The library contains a comprehensive collection of the environmental coverage available in the United States from 1975 through the present. I am familiar with the materials contained in that library and the methods used to catalog and retrieve information from the library.

5. In connection with my activities as a broker, I am frequently asked to evaluate the availability of environmental insurance for particular risk situations. In responding to requests of this type, I utilize my experience with environmental insurance, my familiarity with the underwriters offering such coverage and knowledge of industry practices to design and implement insurance and risk management programs. I keep up to date with developments in the industry by reading articles in and commentaries in publications such as <u>Business Insurance</u>, <u>The National Underwriter</u>, <u>Best's Review</u>, and <u>Risk Management Magazine</u>. I also speak at and attend conferences on environmental insurance and other risk management topics sponsored by bar associations, insurance trade organizations and private sponsors.

6. In connection with the above activities I have become familiar with underwriting practices of insurers offering environmental insurance during the period 1970 to the present and particularly the forms of coverage offered and the underwriting required for the issuance of such forms and coverage. This includes the familiarity with required disclosures by respective policyholders and exclusions of past acts and occurrences in connection with the writing of new environmental insurance. This professional activity and experience is pertinent to the information set forth below concerning underwriting practices and forms of coverage available in the United States.

7.  I have provided expert reports and/or testified at deposition in cases where the availability of insurance coverage for pollution conditions following the adoption by general and excess liability insurers of pollution exclusions was at issue (a list of cases in which I have prepared expert reports or testified is included in Exhibit A).  In those cases, where the opposing parties have included insurance companies and where the insureds claimed millions of dollars in insurance benefits, there has not been any assertion that, following the adoption of the pollution exclusion, there was coverage for pollution other than the types of insurance coverage discussed, infra.

8.  As a result of my education, experience and training, described above, I am knowledgeable about the various types of insurance coverage that were generally available to corporations to address environmental as well as general liability exposures in the United States from 1970 through the present and, except as set forth, infra, during that period there was no generally available insurance coverage for identified pollution conditions at industrial facilities caused by gradual and progressive damage due to releases that took place over a period of months or years. .

9.  I have reviewed the Court's Memorandum and Order Regarding Summary Judgment for the Ansonia and Derby Sites, dated August 5, 2004 ("Opinion"), including the section entitled "Site histories".  I have also reviewed information concerning historical operations at the Farrel manufacturing sites in Ansonia and Derby ("Farrel") contained in the Black & Decker Further Memorandum in Support of Black & Decker's Motion for Summary Judgment With Respect to the Farrel and SHW Sites, dated November 13, 1998, the Supplemental Memorandum of Liberty Mutual dated December 1, 1998 and the affidavit of Jeffrey Loureiro dated February 6, 1998 (without attachments).  I have also reviewed the

Memorandum of Law in Support of Motion of Liberty Mutual Insurance Company for Summary Judgment Allocating Damages Payable for the Ansonia and Derby Sites ("Allocation Memorandum").

10. In the summer of 1970, U.S. insurers writing general and excess liability coverage adopted the so-called 1970 Insurance Services Office (ISO) Pollution Exclusion, which contained an exception for claims arising out of sudden and accidental releases of pollutants (hereinafter referred to as "1970 ISO Pollution Exclusion"). In 1986 these same insurers adopted a more comprehensive form of pollution exclusion known as the "Absolute Pollution Exclusion", which did not include the exception for sudden and accidental releases that appeared in the 1970 ISO Pollution Exclusion. From the adoption of the 1970 ISO Pollution Exclusion through the present, the generally available primary and excess liability insurance for industrial risks in the United States contained either the 1970 ISO Pollution Exclusion or the Absolute Pollution Exclusion.

11. At various times following the introduction of the 1970 ISO Pollution Exclusion, insurance was offered by specialty markets that, to some extent, addressed claims arising out of releases of pollution that were not "sudden and accidental" within the meaning of the exception to the 1970 ISO Pollution Exclusion. These gradual releases of pollutants resulted in repeated or continuous property damage or progressive bodily injury. For example, an underground storage tank for gasoline might develop a leak as a result of corrosion that would not be detected until inventory shortages became measurable or the petroleum hydrocarbons migrated offsite and were discovered in wells, surfacewater or groundwater on the subject property or adjacent properties. Insurance policies that addressed some claims arising out of gradual pollution events of this type were known by several names depending upon the underwriters and the time period

during which this insurance was offered. The earliest of these forms of gradual pollution insurance was called Environmental Impairment Liability insurance ("EIL Insurance"), which was first offered in the United States in 1975. Other similar policies were called Environmental Protection Liability, Pollution Liability or Pollution Legal Liability. I will refer to these types of insurance offered by specialty underwriters prior to 1985 as "Gradual Pollution Insurance". It should be noted that some of these policies were also modified to provide coverage for claims arising out of sudden and accidental releases. This was accomplished by deleting an exclusion that was normally included in the policies for claims arising out of sudden and accidental releases. This modification was made in some cases when underwriters providing general and excess liability to industrial accounts refused to offer coverage for any pollution claims (caused by either sudden or gradual releases) in their policies.

12.     From my education, training and experience with environmental insurance for industrial risks in the United States, I am knowledgeable about Gradual Pollution Insurance, including the terms, conditions, exclusions and other provisions contained in the various Gradual Pollution Insurance policies offered by specialty underwriters in the period from 1975 through 1985, and with the underwriting practices of the specialty insurers that issued Gradual Pollution Insurance policies in this time period. I have written several articles concerning Gradual Pollution Insurance that have been published in insurance and legal journals, and have testified in matters concerning Gradual Pollution Insurance on numerous occasions.

13.     During the period 1971-1985[1], insurance was not generally available to cover claims arising out of exposures involving gradual pollution, such as the gradual pollution that

---

[1]    This affidavit addresses a period ending in 1985 as that is the last year addressed by Liberty Mutual in its Allocation Memorandum. Except as otherwise noted, the same considerations apply to subsequent years.

6

occurred at the Farrel Ansonia and Derby manufacturing sites. The basis for this opinion is set forth in greater detail below.

14.     The 1970 ISO Pollution Exclusion was adopted by insurers writing general and excess liability insurance in the United States in the summer of 1970 and was included in virtually all liability insurance policies issued or renewed for industrial accounts thereafter through 1985 when the Absolute Pollution Exclusion replaced the 1970 ISO Pollution Exclusion in general and excess liability policies written for U.S. industrial accounts.

15.     From mid-1970 until 1974, Gradual Pollution Insurance was not generally available for U.S. industrial accounts. In 1974, certain foreign insurers perceived that there was a potential market for Gradual Pollution Insurance. As a result of this identified need for coverage, these underwriters developed the first Gradual Pollution Insurance (EIL Insurance) policies, which were offered only to risks outside the U.S. in 1974. In 1975, EIL Insurance was first offered to industrial accounts located in the United States by underwriters and Lloyds and other foreign insurers. This type of Gradual Pollution Insurance was offered continuously in the United States until 1984, when it became apparent that Gradual Pollution Insurance could not be offered on this basis for U.S. industrial accounts as a result of claims arising out of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA or Superfund) and other U.S. legislation imposing strict liability on polluting industries. In fact, nearly all underwriters offering Gradual Pollution Insurance to industrial accounts withdrew from the U.S. market by early 1985.

16.     Attached hereto as Exhibits B and C, respectively, are representative policy forms for PLI insurance, including a declaration page and policy jackets; attached hereto as Exhibit E is a representative policy form for EPL Insurance; attached hereto as Exhibit F is a representative

form of EIL insurance, with an attached application; and attached hereto as Exhibit D is a representative form of application for EIL insurance.

17.    Starting in 1980 several domestic insurers, including American International Group and Evanston Insurance Company, introduced other Gradual Pollution Insurance policies that also insured some claims arising out of gradual pollution risks of U.S. industrial accounts. In 1982, a pool of insurers, known as the Pollution Liability Insurance Association (PLIA), made another Gradual Pollution Insurance policy available to industrial accounts to insure claims arising out of gradual pollution.  As mentioned earlier, these policies were known by various names such as Environmental Protection Liability, Pollution Liability or Pollution Legal Liability.  Domestic and foreign insurers offered Gradual Pollution Insurance of the types described above to U.S. industrial accounts continuously through 1985 and beyond.

18.    All Gradual Pollution Insurance that was available in the United States in any time period, including the period from 1975 through 1985, was offered only on a claims-made basis, rather than an accident or occurrence basis.  A statement in capital letters warning that the coverage was provided only on a claims-made basis appears in each of Exhibits B-F.  In a claims-made policy, insurance coverage is provided only for claims that are asserted against the insured during the policy term.  Since the various complaints discussed in the Opinion in this case were not filed as claims against Farrel until 1988, 1989 and 1990, none of the claims-made Gradual Pollution Insurance policies available to U.S. industrial accounts prior to 1988 would have provided coverage for the Farrel Claim.

19.    Most generally available Gradual Pollution Insurance policies written for U.S. industrial accounts during the time period from 1975 through 1985 also contained so-called "retroactive date" provisions that excluded coverage for claims arising out of events or acts (i.e.,

releases of pollutants) that occurred prior to the retroactive date. A representative retroactive date provision from a Gradual Pollution Insurance policy written in the 1975 to 1985 time period is contained in Exhibit C. The underwriting practice of insurers offering Gradual Pollution Insurance with a retroactive date provision was to use the inception date of the policy as the retroactive date. The effect of this practice was to exclude coverage for claims arising out of events or acts of the insured, or releases of pollutants that occurred prior to the inception of the Gradual Pollution Insurance policy. Accordingly, Gradual Pollution Insurance policies that included retroactive dates, which were the same as the inception dates, or even retroactive dates that were a few years earlier than the inception date would not provide coverage for claims arising out of pollution conditions resulting from events or releases of pollutants that occurred at the Farrel Ansonia and Derby manufacturing facilities prior to 1975, including the events in earlier years that are described in the Site histories section of the Opinion and the Loureiro Affidavit.

20. Underwriters offering Gradual Pollution Insurance policies to U.S. industrial accounts in the time period from 1975 through 1985 required the applicant to identify and provide detailed historical information concerning every location that the applicant sought to be covered by the insurance, including the wastes that were or had been generated at each site. Completion of the application by an executive of the potential insured would have resulted in the disclosure of information about operations at the Farrel manufacturing facilities, as described in the Site histories section of the Opinion. This disclosure would have resulted in decisions on the part of underwriters to either: (a) not offer Gradual Pollution Insurance to the prospective insured at all; or (b) to issue Gradual Pollution Insurance with exclusions for known pollution conditions

including the historic releases of pollutants that had occurred at the Farrel Ansonia and Derby facilities.

21.  The management of solvent degreasing that resulted in repeated spills from open containers and the practice of dumping spent solvent sludges in a scrap yard and other areas outside of nitriding building at the Ansonia Plant would have resulted in underwriters either refusing to offer coverage for this facility of offering coverage with exclusions for claims arising out of the presence or release of hydrochlorinated solvents (tetrachloroethylene - also known as perchloroethylene or PCE, and trichloroethylene- also known as TCE) at this facility. Underwriters would also have been aware of the possibility of releases from this facility migrating to the Naugatuck River and into groundwater beneath the plants.

22.  Disclosure of the practice of burning materials adhered to the Banbury mixers in open areas outside of buildings, and spills associated with vapor degreasing of parts with PCE at the Farrel Derby facility would similarly have made underwriters aware of the potential for claims arising from releases of contaminants at this facility. Machine parts that were dipped into the degreaser were allowed to drain onto wooden block floor or on exposed soil areas outside of the building. These conditions would have resulted in underwriters declining to provide a proposal for gradual pollution exposures or to exclude coverage for claims arising out of known pollution conditions.

23.  These disclosures would have resulted in specific exclusions of claims arising out of all solvent, petroleum and polychlorinated biphenol (PCB) releases from the Farrel and Ansonia manufacturing sites. Furthermore, exclusions in the Gradual Pollution Insurance policies generally available to U.S. industrial accounts in the time period from 1974 through 1985 would also have affected the coverage available for the Farrel Claims. For example,

exclusions of claims arising out of onsite disposal of hazardous wastes would have eliminated coverage in the Gradual Pollution Insurance policies for claims resulting from onsite disposal of solvents at the Ansonia and Derby Site. A representative example of a waste disposal exclusion from a Gradual Pollution Insurance policy is contained in Exhibits C, E, F. Moreover, such policies excluded indemnification when claims partially within the scope of coverage grant were combined with claims within the scope of exclusions. See Exhibit F.

24. Gradual Pollution Insurance policies that were generally available to industrial accounts in the United States from 1975 through 1985 contained exclusions for claims arising out of improving pre-existing pollution conditions at sites owned by the Insured, cleanup operations that were considered normal or routine, or upgrading, monitoring, neutralizing, restoring, cleaning up or inactivating waste disposal sites. Representative examples of such an exclusion are contained in Exhibits B, E, F. Claims arising from events that occurred at the Ansonia and Derby Farrel manufacturing facilities, as described in the Site histories section of the Opinion, would have resulted in coverage being barred by pre-existing pollution exclusions such as those described in this paragraph.

25. The provisions I have listed, other than the claims-made limitation, are examples of provisions that were commonly found in Gradual Pollution Insurance policies issued to industrial concerns in the United States during the period 1975 through 1985. Such provisions either were found in policy forms, such as the attached exhibits, or were incorporated in endorsements issued with the policies. For exposures such as the pollution conditions at the Ansonia and Derby manufacturing facilities, any one of the exclusions or underwriting practices list above would have foreclosed coverage of exposures such as the pollution conditions at the Ansonia and Derby Farrel manufacturing facilities. The exclusion of coverage under one

provision would have made the consideration of additional causes for excluding coverage irrelevant. For example, if a policy had a retroactive date that coincided with the date of inception of the policy, this would have served as a fundamental basis for denial of coverage for pollution conditions that pre-dated the inception of the policy. Further consideration of additional exclusions such as that for onsite disposal of hazardous wastes would not have been necessary to exclude coverage of exposures such as the pollution conditions that existed at the Ansonia and Derby Farrel manufacturing facilities in the mid-1970s.

26. Based upon my work in the environmental insurance area and a review of the forms of insurance available for environmental risks in the time period from 1975 through 1985 (including a review of materials I have assembled and maintained in connection with that work), it is my opinion that Gradual Pollution Insurance policies that were generally available during the period 1975 through 1985 and beyond would not have covered the pollution conditions at the Ansonia and Derby Farrel manufacturing facilities. This opinion is based on the fact that available policies were written only on claims-made forms and also due to the presence of one or more of the exclusionary provisions and the underwriting considerations for environmental insurance that I have discussed above.

27. The underwriting of Gradual Pollution Insurance became more sophisticated and somewhat more restrictive during the period from 1975 through 1985, especially when the significance of the liability imposed on U.S. industrial accounts by environmental regulations such as CERCLA was fully appreciated. In fact, the market for Gradual Pollution Insurance went through a disruptive period of restricted coverage in 1984 and 1985 that left only two markets and a maximum capacity of $10 million available for such risks by the end of 1985. Accordingly, it is my opinion that during the entire period 1975 to 1985 the generally available

Gradual Pollution Insurance policies would not have covered exposures such as the historic pollution conditions at the Ansonia and Derby manufacturing facilities. Furthermore, Gradual Pollution Insurance would not have been available for the historic pollution conditions at the Ansonia and Derby Farrel manufacturing facilities in the 1988 through 1990 time period when claims arising out of these conditions were actually made.

I declare under the penalty of perjury that the foregoing is true and correct.


/s/ Rodney J. Taylor                                                                November 15, 2004
Rodney J. Taylor