UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY ) | |
| ) | |
| Plaintiff, ) | C.A. No. 96-10804-DPW |
| ) | |
| v. ) | Case No. 1:04-CV- |
| ) | 10651-DPW |
| THE BLACK & DECKER CORPORATION ) | (Ansonia/Derby, CT Site) |
| BLACK A& DECKER, INC., BLACK & DECKER ) | |
| (U.S.) INC., EMHART CORPORATION, and ) | |
| EMHART, INC. ) | |
| ) | |
| Defendants. ) | |
| ) | |

REPORT IN REBUTTAL OF JAMES A. ROBERTSON, CPCU, ARM

SUBMITTED ON BEHALF OF
BLACK & DECKER CORPORATION

January 19, 2005

Prepared by:
Rodney J. Taylor, J.D., P.E., CPCU, CLU, ARM
Managing Director
Breitstone & Co. Ltd.
534 Willow Avenue
Cedarhurst, NY 11516
(516) 569-2550

REPORT IN REBUTTAL OF JAMES A. ROBERTSON, CPCU, ARM

SUBMITTED BY RODNEY J. TAYLOR, J.D., P.E., CPCU, CLU, ARM
ON BEHALF OF
BLACK & DECKER CORPORATION

1. I have reviewed the Expert Report of James A. Robertson submitted on behalf of Liberty Mutual Insurance Company in the Liberty Mutual Insurance Company v. The Black & Decker Corporation, et al. case (United States District Court, District of Massachusetts, C.A. No. 96-10804-DPW and C.A. No. 1:04-CV-10651-DPW (Ansonia & Derby Sites)) and would like to offer rebuttal testimony to the sections of Mr. Robertson's Report that describe "alternative risk transfer mechanisms" as providing insurance for environmental risks such as those that resulted in the claims at the Farrel Derby and Ansonia Sites. Specifically in Paragraphs 9 and 10 of his report, Mr. Robertson describes fronting programs, captive insurers, group captives and pooled risk arrangements as alternatives that could have been purchased by Black and Decker to provide "insurance" for claims associated with cleanup costs for pollution conditions at these two manufacturing facilities. As discussed in the following paragraphs, the programs Mr. Robertson describes are not accurately characterized in terms of common industry usage, they were not available as he describes them to Black & Decker and they are not insurance.

2. In his description of these risk management alternatives, Mr. Roberston confuses the description of the alternative financing techniques with programs that incorporate them. The mechanisms that he describes are not fronting policies, captive insurance policies or pooling arrangements, but are programs that employ these mechanisms

along with other risk management tools. The programs he refers to as insurance for Black & Decker's environmental risks assume the availability of risk transfer devices such as reinsurance, excess and aggregate coverage for environmental risks that did not exist in the relevant time period and make the use of the described mechanisms for claims associated with the costs of environmental remediation at the Derby and Ansonia Sites impossible.

3. The first of these alternatives described in Paragraph 9 is a fronting program or fronted primary insurance program. A fronting program normally refers to a captive insurance company's use of a licensed insurer to satisfy the insurance requirements in states where the captive owner elects not to make an effort to qualify as a self-insurer – thus the commercial policy is "front" for the insured's captive policy. Fronting may also refer to other arrangements where the insured agrees to indemnify the insurer for all losses and costs incurred under a policy issued by a commercial underwriter. In either of these situations, the issuance of a fronting policy does not involve any risk transfer from the captive, its parent or the insured to the insurer issuing the policy and, therefore, they are not insurance. The only risk inherent in this transaction is the possibility that the owner of the captive or the insured will refuse or be unable to honor its obligations under the policy and the fronting insurer will be obligated to respond. For this reason, most fronting insurers require collateralization of any such obligation to the full limits of the policy if the captive is not adequately capitalized or the financial condition of the parent company poses any risk of default on the captive policy insurance obligations. In my experience, even with very large corporate insureds, the fronting insurer requires collateral equal to the full limits of the policy.

Mr. Robertson continues his description of a fronting program in Paragraph 10 by stating that fronting was an approach commonly used by large corporations to manage and finance specific risks of loss. This might be true to the extent that Black and Decker utilized a captive insurance company to manage and finance such risks, but this does not imply any transfer of these risks to an unrelated commercial insurance company. Furthermore, the most common use of fronting policies is for workers' compensation insurance where the insured's captive is not qualified as a self-insurer and not for environmental risks where exposures are uninsurable in the commercial market. He then states that Black & Decker could easily have arranged a fronted program to manage and finance its pollution risks. This assumes that a commercial insurer was willing to provide a fronting policy for the captive or for Black & Decker directly for such risks. Insuring environmental risks in a company-owned captive does not involve risk transfer. In fact, the use of a captive is (as described below) a decision to retain the risk. Mr. Robertson also assumes that a commercial insurer would be willing to front the Black & Decker captive that wrote these risks. As discussed above, the fronting insurer did not assume any risk of the underlying insurance policy. If an insurer decided to issue such a fronting policy, the risk of the parent's default, as described above, was protected by collateral equal to the limit of the policy, and it is my opinion that insurers would not have been willing to offer a fronting policy for environmental risks such as those at the Ansonia and Derby facilities at any time during the relevant period.

Mr. Robertson's description of a fronting program continues with a discussion of how claims are handled which is irrelevant to the issue of risk transfer. He then states that in a typical program, the insured is responsible for all costs associated with the first dollar of loss and expenses, up to a specified limit above which the insurer is responsible for all amounts of excess loss. This is not a description of a fronting policy, it is a fronting policy combined with a per occurrence or aggregate excess insurance policy. His description assumes that a commercial insurer was willing to write excess coverage for Black & Decker's captive insurance company or for another fronting arrangement that would protect the captive (and the insured) from such losses. I do not believe that such risk transfer was available to Black & Decker for the claims arising out of the Derby and Ansonia facilities or for other environmental risks associated with the company's operations.

The description of fronting programs continues with the payment of administrator's costs in installments and monthly payments of the funds required to pay claims, and finally, a retrospective premium after the policy expires. The program that Mr. Robertson describes is not a normal fronting program as they are typically established in the alternative finance market, since the normal fronting fee is paid at the time the policy is issued and there is no other payment during its term. His description appears to be referring to some combination of a fronting policy with a self-funding component that still requires a rate adjustment after expiration. If such a program ever existed, it was not written for environmental risks, and would not appear to involve any risk transfer to a commercial insurer as is described in Paragraph 10 of

Mr. Robertson's report. This is obviously not insurance that was available to black & Decker for the environmental risks at the Ansonia and Derby facilities.

The description continues with the statement that virtually all such plans involve a transfer of risk to the insurer. This statement is not accurate. Pure fronting policies do not, by definition, involve any transfer of risk to an insurer. They are more appropriately referred to as risk retention mechanisms. Again, Mr. Robertson is describing some type of combined program that includes excess or aggregate protection and a fronting policy, with risks excess of a retained amount transferred to a commercial insurance company. While such programs may have been available to Black & Decker or other industrial accounts for workers' compensation or automobile liability exposures, they were not available for environmental risks such as those that gave rise to the claims at the Ansonia and Derby facilities. Any fronting program that could have been used for such risks would not have been insurance.

Mr. Robertson also states that timing of payments also creates a risk for the insurer. This also describes something other than a fronting policy. In the pure fronting policy, there is no risk that the insurer will pay a claim and then have a time lag before the captive reimburses its costs. If the risk is that the captive and/or the parent will default on the captive policy obligations, the insurer will use the collateral, which is required for any policy where the commercial insurer might become obligated to pay claims.

Another assertion in Mr. Robertson's report is that fronted programs help the insured create primary insurance for risks that otherwise might be difficult to insure, and that

6

such programs provide a foundation for excess or umbrella insurance that would be available excess of the primary limits. In the first place, the primary programs that are created by fronting policies are not insurance – defined as a transfer of risk to an unrelated third party for a premium. As described above, the fronting policy is merely a commercial insurer's agreement to allow its paper to be filed in the place of the insured's captive where the insured elects not to have its captive qualified as a self-insurer or the issuance of a policy with an indemnity agreement under which the insured agrees to reimburse the insurer for all claims under the policy. This does not involve risk transfer.

Furthermore, the use of a fronting policy to provide primary environmental coverage (if such a program were available), would not make excess or umbrella coverage available from commercial insurers for those environmental risks. Since the fronting policy is issued to the insured's captive or directly to the insured with an indemnity agreement and involves no risk transfer, this would assume that the commercial insurer would be willing to offer excess liability with the insured's captive or the insured's retention of the risk as primary coverage. I know of no instance where this was the case and believe that it was never possible to purchase excess liability for environmental risks such as those at the Ansonia and Derby facilities because a fronting policy was in place to address such risks on a primary basis.

4. Mr. Robertson also mentions captive insurers as a means of "managing and financing" primary risks of loss. This may be true, but it does not involve the transfer of risks to a commercial insurer. A captive insurance company is an

insurance subsidiary designed to cover the risks of its parent organization. Any risk transfer requires the use of excess coverage or reinsurance, which are not automatically included in any captive insurance program. Furthermore, such excess protection and reinsurance are not and never have been available to captive insurers for environmental risks such as those giving rise to the claims at the Ansonia and Derby facilities.

There have never been a large number of insurers active in the reinsurance market that provided coverage to insurers for environmental risks. Those who were involved in this segment of the market chose to participate where there was specialized underwriting expertise, volume of business, and standardized coverage forms. This meant that they offered capacity only to the insurers offering primary environmental coverages and not to captives that did not have underwriting capability, volume or standard forms for their environmental coverage.

Group captives are sometimes formed to insure the risks of multiple organizations. In such arrangements, there is necessarily a sharing of risks among the entities that participate in the group captive. At times, efforts were undertaken to develop group captive programs for environmental risks, especially when these risks became difficult to insure in the standard markets. I know of no case in which such efforts resulted in a group captive that actually insured the environmental risks of multiple entities. The lack of reinsurance for environmental risk insurers discussed above is one reason these programs were not successful. Furthermore, the lack of uniformity among potential insureds' environmental risks made any agreement on the pricing of

such coverage problematic. For these reasons, I do not believe captive insurance policies on an individual or group basis would have been available as insurance to provide risk transfer protection to Black & Decker for the claims arising out of the Ansonia and Derby sites.

5. Pooling arrangements are also mentioned as risk management and financing mechanisms that could have been used to provide insurance for the risks of environmental loss at the Ansonia and Derby facilities. Pooling is a risk financing technique designed to address loss exposures of the pool's members. It is most commonly used by municipalities and other public entities to provide protection against workers' compensation, public liability, property or employee benefits loss exposures. A common factor in these risks is that they occur with a regular frequency and result in losses that are generally predictable from an actuarial point of view.

Like the group captive discussed above, pooling arrangements necessarily involve a sharing of risks among the members. Since environmental risks do not occur with a regular frequency and are not actuarially predictable, they have never been good candidates for pooling. Furthermore, no excess, aggregate or reinsurance protection is available for environmental risks, making them even less likely to be managed in pooled programs. There are also underwriting requirements for every risk that is to be insured in a pool, just as there are with any risk sharing mechanism. Even if environmental risks generally could have been placed in some type of pooled risk arrangement, there is no pool that would have accepted the environmental risks at the

Ansonia and Derby facilities based on even the most rudimentary of underwriting reviews.

The only environmental pool that actually wrote environmental insurance on a broad basis was the Pollution Liability Insurance Association (PLIA), which was active in providing coverage on behalf of participating insurance companies from 1982 through 1989. This pool was a formal underwriting facility that provided coverage on a selective basis to accounts that qualified for coverage in accordance with its underwriting standards, which were similar to those of any other insurer writing environmental insurance. It was not a multiple manufacturer risk sharing pool of the type described by Mr. Robertson as an alternative financing mechanism for environmental risks.

The submission of the Ansonia and Derby sites for coverage in PLIA in any of the years of its operation would have resulted in a review by trained environmental underwriters that considered the age and historic practices of the plants, including the use and onsite disposal of chlorinated solvents and other operations likely to result in releases of contaminants into the environment. If coverage had been offered at all, there would have been exclusions for claims arising out of these areas of known contamination. Furthermore, the PLIA policies always contained exclusions for onsite cleanup that would have applied to nearly all of the costs associated with the Ansonia and Derby claims. For the reasons stated above, I do not believe that pooling arrangements, including coverage provided by PLIA would have been

available as insurance for the claims arising out of environmental conditions at the Ansonia and Derby facilities.

6. There is a lack of specific reference in Mr. Robertson's report to the nature of the environmental risks at the Farrel Ansonia and Derby plants that allows him to make general statements about available insurance and alternative risk financing programs that is completely inaccurate when the actual conditions at those sites is considered. He discusses insurance policies, including those modified by the deletion of pollution exclusions, which might have been offered to some accounts, where environmental risks were negligible and well managed. This is completely inaccurate when the question under consideration is whether such insurance was available for the serious and poorly managed environmental risks at industrial sites like Ansonia and Derby.

7. In his deposition, Mr. Robertson refers to seeing mercantile and trucking accounts written by the Hartford Insurance Company during his service with that company as an underwriter on policies that did not incorporate pollution exclusions. His work as an underwriter ended in 1974, two years before RCRA and six years before CERCLA. This modification would have involved the deletion of the 1970 ISO pollution exclusion, which incorporated a sudden and accidental release exception. Even for this group of accounts, Mr. Robertson has been unable to recall the name of a single insured entity where such a policy was, in fact, issued.

Even if such policies (with no gradual pollution exclusion) were issued to Hartford accounts in 1974, there is a material difference between the environmental risks associated with mercantile accounts, which have little or no pollution exposure and

ancient manufacturing facilities where hazardous materials were used without proper safeguards for decades and disposed of by dumping them out the back door. There is also a material difference between the environmental risks associated with trucking operations and old industrial plants like the Ansonia and Derby facilities. The environmental risks associated with trucking companies are primarily sudden and accidental release exposures associated with over-the-road operations. Releases are typically due to collision and upset of vehicles with motor fuels and, in some cases, hazardous cargos onboard. Spills of this nature are discovered immediately and cleanup typically occurs within hours of the release. This must be contrasted with industrial sites like Ansonia and Derby where hazardous solvents were used in the open or without adequate secondary containment, and disposed of onsite for decades. Releases were unlikely to be recognized or remediated in time to prevent serious onsite contamination of soil and groundwater and a threat of offsite migration.

Mr. Robertson also alleges that the Hartford wrote policies for trucking accounts that provided coverage for underground storage tanks where motor fuels were stored at terminals. If this had been true in 1974 (before RCRA), it was certainly not true by 1980, when tank inspection and financial responsibility rules were in effect. Even if underground tanks at trucking facilities could be insured on CGL policies in 1974, this does not indicate that the same insurer would have issued coverage for environmental risks at the Derby and Ansonia sites where hazardous materials had been and were used in large quantities and historic disposal practices made releases into the environment a certainty.

The acceptability of risks to underwriters is based on commercial and industrial classifications, which recognize differences in the hazards associated with various types of operations and take into account the actual claims experience with such accounts. Mr. Robertson conveniently ignores this distinction if referring to all accounts as being equal from a risk and insurability standpoint. In fact, industrial risks have always been recognized as involving greater risk than commercial accounts and the underwriting of such risks has always considered this difference in terms of pricing and coverage offered. Industrial accounts are further classified by insurers in terms of their inherent risks, and heavy industry with significant chemical exposure has always been ranked as a difficult class to insure successfully. Rates and coverage restrictions for risks in this class reflect the difficulties encountered in underwriting and insuring them. The risk profiles and classification system utilized by the insurance industry cannot be ignored in considering the availability of insurance for environmental risks at the Ansonia and Derby facilities.

I declare under the penalty of perjury that the foregoing is true and correct.

_____                                        January 19, 2005
Rodney J. Taylor